[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 876 
On Application for Rehearing
The original opinion of January 8, 1999, is withdrawn and the following opinion is substituted therefor.
Tillis Trucking Company and Willie Ray Pride appeal from a judgment on a jury verdict awarding $7,000,000 to Malachi Moses, Josephine Horton, and Jimmie Horton, as personal representatives of the estate of Cynthia Diane Moses, deceased.[1] The jury found that Mr. Pride, acting in the line and scope of his employment with Tillis Trucking, had wrongfully caused the death of Mrs. Moses when he drove a truck loaded with logs onto the highway along which Mrs. Moses was travelling and caused her to drive her vehicle into the truck. In separate appeals, Tillis Trucking and Mr. Pride argue that the trial court committed various errors during the trial, such as improperly admitting certain evidence over objection and overruling objections to improper arguments of counsel; *Page 877 
that the verdict should be reduced, under applicable remittitur standards; and that the long-standing construction of the Alabama Wrongful Death Act, § 6-5-410, Ala. Code 1975, as providing only for punitive damages is unconstitutional.
Because the evidence regarding how the collision occurred is pertinent both to the issues about the conduct of the trial and to the issue of excessiveness of the award, we set forth the following rendition of the facts as suggested by the evidence presented at trial.
There were no known surviving witnesses to the collision other than the driver of the vehicle with which Mrs. Moses's vehicle collided. Mr. Pride denies that his truck was involved in the collision. However, the evidence suggested that he turned left onto a highway, going up a hill, in the pre-dawn darkness, with two of the lights on the left side of his trailer not working; that before he reached enough speed to pull the trailer out of the lane of traffic he was crossing, Mrs. Moses came down the hill and could not see his trailer because of headlight glare from the truck and because the one working light on the trailer would have been obscured by the frame of the trailer; that the left rear wheels of the trailer actually rolled over the front of her vehicle after it had collided with the side of the trailer; and that rather than stopping to give assistance to Mrs. Moses, Mr. Pride kept driving. Mrs. Moses died shortly after the accident, from injuries she suffered in it. Because the defendants continue to dispute that the collision happened in this manner, we shall set forth the evidence in some detail.
Approximately 5:30 a.m. on December 14, 1994, a passing motorist on County Road 50 in Dale County found Mrs. Moses dead in her motor vehicle, a 1988 Suzuki Samurai, which had been severely damaged and was resting partly in the eastbound lane of the road and partly on the shoulder of the road. The Suzuki had obviously been involved in a vehicular collision, but the other vehicle had left the scene. Tree bark was mixed with the debris from the vehicle and was found inside it. There were muddy tracks from the tires of tractor-trailer trucks that had entered the county road near the point of impact. The tracks came from a dirt road on the south side of the county road. Some of them turned west, crossing Mrs. Moses's lane of travel, and some turned east. The first officer on the scene testified that the tracks turning left (west) were "extremely fresh" and the ones turning right (east) were not as fresh, that they had "been taken away by traffic."
The dirt road from which the tracks entered the county road led to a logging site operated by Tillis Land and Timber Company.[2] Four months before this collision occurred, Lowell A. Tillis, Sr., the owner of Tillis Land and Timber, had incorporated Tillis Trucking Company, whose only assets were several logging trucks, including the one that Mr. Pride was driving on the morning of the accident in question. The evidence showed that drivers leaving the logging site with a full load could either turn left and proceed west on County Road 50 or turn right and proceed east. The trucks could reach their destination sooner by taking the westward route. The defendants asserted, however, that the drivers always turned east. An employee of Tillis Trucking testified that, on the day before he gave his testimony, he had made a left turn at the intersection with County Road 50 with a fully loaded truck, and that in doing so he could not reach a speed above five miles per hour, because, he said, at that point County Road 50 ran up a steep hill to the west. Mr. Pride testified that it was dangerous to make the left turn because doing so caused a truck to block both lanes, and he said that he did not do so. *Page 878 
On the morning of Mrs. Moses's death, Mr. Pride drove a tractor with an empty trailer to the logging site about 4:45 a.m., to drop off the empty trailer and pick up a loaded one. He attached trailer number 917 to his tractor. At the back of the trailer is a bright light called a "pole light." Mr. Pride did not turn on the pole light on trailer 917 before he drove away, because it was too dark to see to connect the wires to give it electrical power. Mr. Pride said that he stopped at Dykes Store, a few miles eastward on County Road 50, and there connected the wires for the pole light and tightened down the load of logs.
The defendants contend that Mr. Pride left between 5:00 and 5:10; that Mrs. Moses did not leave her house until 5:10; and, therefore, that she arrived at the scene after Mr. Pride had passed it. However, the evidence regarding the time of these events was approximate. Mr. Pride testified that it took an hour and a half to an hour and 45 minutes to reach the paper mill where he delivered the logs, near Graceville, Florida. He contended that he arrived there at 6:40. There was evidence, however, indicating that the trip could be made in an hour and 15 minutes, and it is not clear exactly when he arrived; he weighed in at 6:53. The plaintiffs showed that, according to the weigh-in and weigh-out times, he spent more time at the mill than the other drivers did that morning. The plaintiffs assert that the extra time gave him the opportunity to clean from his trailer the visible evidence of the collision.
As further evidence that the accident must have occurred after Mr. Pride had driven away, the defendants cite the evidence indicating that, when paramedics arrived at 5:49 Mrs. Moses's body was still warm. The plaintiffs argue that she had survived until shortly before her body was discovered at 5:30, or had survived perhaps even longer, although the person who discovered her body at 5:30 could not feel a pulse. They point out that she had curled into a fetal position on the seat of the Suzuki and had pulled her jacket around her shoulders.
The defendants argue that the circuit court erred in admitting photographs showing Mrs. Moses's body in the Suzuki and showing it after it had been removed, and in overruling objections to testimony by the paramedics. They cite Bagley v. Grime,283 Ala. 688, 692, 220 So.2d 876, 880 (1969), in which the Court stated, "We cannot see that a photograph of this crumpled body lying in a distorted position could shed any light on the issues of this case." In contrast, however, the position of Mrs. Moses's body on the front seat of her vehicle was relevant to the argument that she had died some time after the collision. The photographs support the plaintiffs' argument that she did not die instantly in the collision and that, therefore, the collision could have occurred around 5:10 rather than just before 5:30, as the defendants suggested.
Tillis Trucking had three drivers hauling loads from this logging site. Three trailers had been loaded the previous day for early morning pickup. Mr. Pride arrived first, and the other two drivers arrived after the police officers and others had arrived at the accident scene. There was no evidence to indicate that any other truck left the logging site in the time between Mr. Pride's exit and the supposedly later time of Mrs. Moses's fatal collision. It is unclear whether the defendants take the position that Mrs. Moses's Suzuki collided with an unknown truck that might have been leaving the area logged by Tillis Land and Timber Company. They do imply that she might have crossed the center line and collided with a westbound truck unrelated to Tillis Trucking. However, the evidence suggesting that she crossed the center line is scanty or nonexistent. For example, a "beauty ring" (a type of wheel cover) and the antenna from the Suzuki were found across the center line, in the westbound lane. All the other debris was found in the eastbound lane. The defendants argue that oil from the Suzuki *Page 879 
was found on or across the center line, but the plaintiffs presented evidence indicating that the oil the defendants refer to was not there until after the Suzuki was towed away. The first police officer on the scene testified that there were no fluids in the westbound lane when he arrived, and the first state trooper to arrive also said there were no fluids across the center line.
The strongest evidence indicating that it was Mr. Pride's trailer that Mrs. Moses's Suzuki struck came from the investigation of the trailer itself. When Mr. Tillis and several Tillis Trucking employees reached the scene of the collision shortly after 6 a.m., they realized that Mr. Pride was the only Tillis Trucking driver unaccounted for. They attempted to reach him on his truck radio. After about 15 minutes, he responded. He was told to return to the scene of the collision. Instead of turning onto Highway 231 in Dothan, however, he proceeded north on Highway 431, toward the office and trailer yard of Tillis Land and Timber and Tillis Trucking. The officers at the scene of the collision suspected that he was not returning to the intersection on County Road 50, and because of their suspicion, they sent out a call to other officers to be on the lookout for his truck and to stop it.
Officer Jason Hughes, of the Headland Police Department, stopped Mr. Pride on Highway 431 near the line separating Houston County and Henry County. Several state troopers arrived at that point and inspected the truck. The defendants assert in their brief that the first trooper on the scene, Officer Tolbert, "performed a detailed inspection of the tractor and trailer looking for evidence of a collision, but he did not find any." However, the testimony on the page of the record cited by the defendants does not indicate that Officer Tolbert performed a detailed inspection:
 "Q. Now, with respect to the time you got there, is it true that you got there about 8:10 and you did a walk-around?
"A. That's correct.
 "Q. And you did not see any damage to the tractor or trailer that was consistent with a high-speed impact?
"A. None that was very obvious at the time."
Later, Officer Powell and Sergeant Bowers, both state troopers, arrived and did a thorough inspection. Wedged into a crack or a seam referred to as the "belly band" were paint and amber-colored glass that were identified as having come from Mrs. Moses's Suzuki. The troopers also discovered along the rail of the trailer a paint transfer that matched the color of the paint on the Suzuki. Later that day, the troopers placed the truck and the Suzuki in the positions that the evidence indicated they would have been in at the point of collision. Officer Tolbert testified in detail as to how the trailer matched the pattern of damage on the Suzuki, and how damage to the trailer, such as fresh scrapes and a broken spring, would have been caused by an impact with the Suzuki. He was asked, "Were you satisfied, based on what you had done and the photographs you took and the observations that you made, that trailer 917 was the unit involved in the collision with this car?" He answered, "There's no doubt in my mind that was it."
In short, the defendants assert that the inspection of the trailer and the accident investigation were conducted in an unprofessional manner. They seem to insinuate that, because Trooper Tolbert did not notice the paint and the glass wedged up under the truck when he did his "walk-around," what they called his "detailed inspection," then Trooper Powell, who came from the site of the collision, must have planted the evidence there.
The defendants argue that the troopers and others were allowed to offer opinion testimony as experts without a proper foundation as to their qualifications. They argue:
 "For example, Acey Tucker admitted that he has never been to accident reconstruction *Page 880 
school, nor was he qualified to teach accident reconstruction. He has never studied physics or the velocities of colliding vehicles. . . . Nevertheless, the court allowed him to give opinions and testify about the point of impact based solely on the debris he observed on the road."
Contrary to the implication of this argument, the circuit court initially sustained the objection to testimony by Officer Tucker, the first state trooper to arrive at the scene, regarding the point of impact. The plaintiffs' attorney then elicited the following testimony from Officer Tucker:
"Q. Officer Tucker, how old are you?
"A. Thirty-six.
 "Q. And when did you first start working with the Alabama State Troopers?
"A. In May of 1980.
 "Q. In 1980 did it require some type of an education or training program before they would put you on the street, so to speak, to investigate accidents?
"A. Yes.
"Q. Did you undertake such training?
"A. Yes, sir.
". . . .
 "Q. Could you describe for the jury the type of training that you received as it might relate to accident investigation?
 "A. The accident investigation training is sort of general in the academy. I don't remember the exact period of time that you spend in accident investigation, but it is one of the longest parts of that training that we had.
 "Q. Do they have specialized courses in point-of-impact determination?
"A. Yes, sir.
"Q. Did you undergo those studies?
"A. Yes, sir.
"Q. Did you pass them?
"A. Yes.
 "Q. Have you been certified or deemed proficient in the determination of points of impact by this authority?
"A. Yes, sir.
"Q. What year did you complete that?
"A. In 1981.
 "Q. What courses since 1981 have you had in accident investigation where point of impact is a part of the investigation?
 "A. Well, we have to go through in-service training every year. During that time, every year accident investigation is not covered, but they cover different areas of law enforcement. Since that time I do remember accident investigation being covered several times during in-service schools.
". . . .
 "Q. How many accidents have you investigated since 1980, just an estimate?
"A. It's been several hundred, I imagine.
 "Q. In how many of those have you had to determine point of impact?
"A. Every one of them if possible.
"Q. Is that what your job is on a day-to-day basis?
"A. Yes, sir.
 "Q. Did you do that for the accident involved on Highway [sic] 50?
"A. Yes, sir.
"Q. Were you able to determine a lane of impact?
"A. Yes, sir.
"Q. Which lane was that?
"A. The eastbound lane.
 "Q. And that is the lane of travel in which the Suzuki automobile was traveling?
"A. Yes, sir.
 "Q. [Were] there any indications of impact in the westbound lane?
"A. No, sir." *Page 881 
The argument that Officer Tucker was not qualified to give this opinion, because he had not been to accident-reconstruction school and had not studied physics, is not well taken. See McKelvy v.Darnell, 587 So.2d 980, 984-85 (Ala. 1991), in which the Court held that a state trooper with much less experience and training than Officer Tucker had had was properly allowed to testify as to the speed of a vehicle at the time of a collision (speed surely being a question requiring more expertise than the question of the point of impact in this present case). Moreover, we note that the defendants did not renew their objection and, thus, there is no adverse ruling to support this argument.
We have studied the record of the other testimony by the investigating officers to which the defendants point as instances of error. The record shows no error as to that testimony. Several of the instances complained of regarded the officers' efforts on the afternoon of December 14 to place trailer 917 and the Suzuki in proximity to see whether the patterns of damage matched. For example, Deputy Sheriff Ford was asked, "Did the metal areas of the trailer match to the damage you see in the automobile?" The court overruled the defendants' objection, and Deputy Ford answered, "Yes, sir, they matched." He was asked about the color of the paint markings on the bumper of the Suzuki: "And in terms of color, was it consistent with the paint or primer layer found on the trailer metal?" He answered, "Yes, sir," and the court overruled an objection (although the objection was untimely, we do not decide the question on that ground). These were simply observations that anyone could make without expertise; no opinion testimony is involved.
 "The question of whether a particular witness will be allowed to testify as an expert, and the scope of that expert testimony, are largely discretionary with the trial court, and that decision will not be disturbed on appeal without a showing of palpable abuse."
Ellingwood v. Stevens, 564 So.2d 932, 935 (Ala. 1990). The defendants' arguments regarding the supposed opinion testimony have no merit.
The defendants also argue that the circuit court erred in admitting a videotaped animation of the accident prepared and presented by an animation expert, Richard Shealy. Shealy was allowed to testify out of order, subject to later proof of the underlying facts on which he based the animation.
 "A witness who has qualified as an expert may give an opinion based upon his or her own knowledge of facts, stating those facts and then his or her opinion, or he or she may give an opinion based upon hypothetical questioning as to facts already in evidence, or evidence to be subsequently admitted."
Crawford v. Hall, 531 So.2d 874, 875 (Ala. 1988). Shealy had participated in a survey of the accident site;[3] he had viewed the photographs and videotapes made by the officers inspecting the accident scene; and he had talked with, and read the depositions of, the plaintiffs' experts on accident reconstruction and nighttime-vision effects. He was qualified as an expert in computer-generated animation, and the animation was shown, at the time and by later witnesses' testimony, to be based on the evidence and the admissible opinions of the plaintiffs' experts. Thus, the argument that Shealy was not properly qualified and that his animation was based on facts not in evidence is not well taken.
The parties dispute whether the animation was admitted as substantive evidence or was merely used as a demonstrative *Page 882 
aid. The defendants argue that to admit it as substantive evidence would be error, citing Hinkle v. City of Clarksburg, 81 F.3d 416
(4th Cir. 1996), Datskow v. Teledyne Continental Motors AircraftProducts, 826 F. Supp. 677 (W.D.N.Y. 1993); and Pierce v. State,671 So.2d 186 (Fla.Dist.Ct.App. 1996).[4] The defendants have not shown that the animation was admitted as substantive evidence, and they did not bring this distinction to the circuit court's attention. "This Court will not hold a trial court to be in error unless that court has been apprised of its alleged error and has been given the opportunity to act thereon." Sea CalmShipping Co., S.A. v. Cooks, 565 So.2d 212, 216 (Ala. 1990).
One basis on which the defendants objected to the animation is that it showed one of the headlights of the truck, and two of the side lights, as not burning.[5] However, there was evidence that these lights were not working when Mr. Pride was stopped at 8:00 a.m. The defendants argue that, under the rule ofSimmons v. Sessions Pulpwood Co., 424 So.2d 592 (Ala. 1982), this evidence was improperly admitted. In Simmons, the driver of a wrecker was allowed to testify that, when he towed the plaintiff's wrecked trailer from the scene, its brakes were working on only one wheel. This Court held that the admission of that evidence was error, because other evidence had indicated that the accident had caused substantial damage to the plaintiff's trailer, including its wheels. The Court held that, because of the evidence of that damage, there could be no presumption that the condition of the plaintiff's brakes before the accident was similar to the condition of the brakes after the accident.
Here, by contrast, there was very little damage to Mr. Pride's trailer, and there is no evidence of damage in the area of the lights that were not working. The circuit court did not err in admitting the evidence that the lights were not working. The defendants' argument — that the lapse of time casts doubt on a conclusion that the lights were not working at the time of the collision — goes to the question of the weight and probative value the jury was to give the troopers' evidence that the lights were not working, not to the admissibility of that evidence. Because the troopers' evidence was properly admitted, the court did not err in admitting the animation over the objection that it showed the lights not working.
The defendants also argue that the plaintiffs were improperly allowed to argue that Mrs. Moses suffered before she died; the defendants say that this argument by the plaintiffs was based on evidence that had been excluded. However, the plaintiffs' argument pertained to the defendants' assertion that because Mrs. Moses's body was warm when the paramedics arrived, the collision must have occurred after Mr. Pride had passed the intersection with County Road 50. Although some evidence on this subject had been excluded as cumulative and unnecessarily graphic, there clearly was other evidence on this subject. The court did not err in overruling the defendants' objection.
Tillis Trucking argues that the circuit court, by denying a motion to continue, prevented its lead counsel from participating in the trial. It argues that the circuit court failed to comply with this Court's standing order on "attorney calendar conflict resolution." However, Tillis Trucking filed its motion to continue on *Page 883 
August 21, 1996, two days after the jury had been selected for the trial, which was to begin either on Friday, August 23, or Monday, August 26. The motion stated that Tillis Trucking's lead counsel was involved in a trial that "is expected to try the entire week of August 19, 1996, and to go over into the week of August 26, 1996."
This Court's "Attorney Calendar Conflict Resolution Order" reads:
 "Whenever an attorney receives notice of the setting of any case for trial or of any motion for a hearing, the attorney shall immediately review his or her calendar and determine if the setting causes a scheduling conflict.
 "When an attorney is scheduled to appear in more than one court at the same time, or within such a short period that the attorney cannot reasonably be expected to appear in both courts, he or she shall, upon receipt of the notice producing the conflict, immediately attempt to make adequate arrangements for representation of each client's interest by substitution of counsel or shall otherwise attempt to resolve the conflict by consulting with counsel representing the adverse parties in the conflicting cases.
 "If the attorney is unable to resolve the conflict by the means suggested in the [preceding] paragraph, he or she shall promptly attempt to resolve the conflict by filing an appropriate motion with one or more of the courts involved.
 "If the attorney is unsuccessful in resolving the conflict by motion, he or she shall forthwith
consult the judges involved in the conflicting cases, notifying them of the efforts he or she has made to resolve the conflict and of the fact that those efforts have been unsuccessful.
 "It shall be the duty of the judges involved to resolve the conflict by consultation and to notify the attorney of the resolution. In the event the judges involved cannot resolve the conflict, then either attorney may request that the conflict be resolved by a judge or a panel of judges appointed by the chief justice.
 "No resolution of a conflict shall result in a continuance unless a continuance is expressly ordered by a trial judge.
 "Once there has been entered an order establishing a priority among conflicting cases, that order will not relieve an attorney from appearing in secondary proceedings in the event the priority case is settled, dismissed, or rescheduled for whatever purpose."
Ala. Code 1975, Vol. 23A, p. 683 (Lawyers' Coop. 1996) (emphasis added), and see also p. 681 for the administrative order of the Chief Justice adopting this order; Alabama Rules of Court 1999 (West), at 720.
Tillis Trucking argues that it "clearly complied" with this order, that "the trial court refused to resolve the conflict," and that Tillis Trucking "took all reasonable and proper steps to reach an amicable solution to the conflict." We disagree. The order clearly contemplates that an attorney will "immediately" consult his or her calendar when a trial is scheduled, that he or she will attempt to resolve the conflict "immediately" upon learning of it, that he or she will "promptly" file a motion if the informal attempts are unsuccessful, and that the attorney will "forthwith" consult with the judges involved in the conflicting cases if the motion is unsuccessful. No showing of any such efforts is made here. Rather, after the first trial had begun, and after the jury had been selected for the second trial, Tillis Trucking moved for a continuance. There is no showing of any earlier attempts to resolve the conflict and certainly no showing that the formal steps contemplated by the order were followed.
Moreover, it appears that the first trial ended shortly after this trial began on Monday, August 26. Tillis Trucking asserts that its lead counsel "was effectively prevented from participating, because to enter the trial once it had begun would have been disruptive." In other words, *Page 884 
lead counsel made a strategic decision not to appear even though he was available. Tillis Land and Timber and Tillis Trucking were represented at trial by another member of the prestigious Birmingham firm of which their absent lead counsel was a member, and by local counsel. Mr. Pride was represented by a member of a prestigious Montgomery firm. These attorneys ably conducted the trial for the defendants.
Under the circumstances, there was certainly no violation of the Attorney Calendar Conflict Resolution Order, and there was no abuse of discretion in the denial of the eleventh-hour motion for a continuance. "[C]ontinuances are not favored, and this Court will not reverse the trial court's decision unless there has been a clear abuse of discretion." Wood v. Benedictine Soc. ofAlabama, Inc., 530 So.2d 801, 805 (Ala. 1988); Ex parte Windsor,683 So.2d 1042, 1047 (Ala. 1996), cert. denied, 520 U.S. 1171
(1997).
Tillis Trucking argues that the circuit court erred in denying its motion for a mistrial when the plaintiffs' attorney referred to a letter from the Department of Transportation citing Tillis Trucking for safety violations.[6] A supervisor for Tillis Trucking, Ricky Hayes, had testified to the effect that Tillis Trucking had a good safety record. On cross-examination,[7] the plaintiffs' attorney asked: "You don't deny that the Department of Transportation rates Tillis Land and Timber Company as unsatisfactory in the transportation department, do you?" The defendants' objection was sustained. The plaintiffs' attorney then showed Mr. Hayes a document marked as Plaintiffs' Exhibit 109 and asked, "Who is that letter from?" The defendants asked to see the exhibit, and a conference was held outside the presence of the jury. The exhibit was a letter the plaintiffs' attorney had received from the Department of Transportation, and the defendants objected that the document contained only hearsay. The following then occurred:
 "[Defense attorney]: On that basis, we would move for a mistrial unless we get a cautionary instruction
from the Court in this regard as to [the plaintiffs' attorney] —
 "[Plaintiffs' attorney]: Your Honor, it's a U.S. Government document and it's being offered for the purpose of knowledge and notice, his awareness.
 "THE COURT: I sustain the objection. Bring the Jury back.
"(Jury returned.)
 "THE COURT: Ladies and Gentlemen of the Jury, I sustained the Defendant's objection to any reference to any safety rating by the U.S. Department of Transportation. So, that means that you are not to consider any safety rating by the U.S. Department of Transportation and you are not to speculate as to what the rating may or may not have been, whether it was good or bad, satisfactory or not."
(Emphasis added.) The defendants' attorney asked for a mistrialor a cautionary instruction. The circuit court gave a cautionary instruction, and the defendants did not again ask for a mistrial. There is no adverse ruling. "[I]t is familiar law that an adverse ruling below is a prerequisite *Page 885 
to appellate review." CSX Transp., Inc. v. Day, 613 So.2d 883,884 (Ala. 1993).
Tillis Trucking argues that the circuit court erred in giving a jury charge on the sudden-emergency doctrine. It cites Merrittv. Simonson, 630 So.2d 428, 430 (Ala. 1993), for the proposition that, for the doctrine to be applicable, "the sudden emergency must not be the fault of the one seeking to invoke the doctrine." It argues that Mrs. Moses was at fault because her driver's license required her to wear glasses and she was not wearing them on the morning of the accident; because she was not wearing her seat belt; and because "she maneuvered her car to the left side of her lane, if not across it." The failure to use the seat belt obviously did not contribute to the creation of the emergency, and the direction her car traveled after she applied the brakes is the very point of the doctrine: with time to react, one might swerve to the right side of the road, whereas, slamming on her brakes as the trailer loomed out of the darkness, Mrs. Moses may have caused her car to move to the left rather than the right.[8]
As to the glasses, the plaintiffs submitted evidence indicating that Mrs. Moses had received the restriction on her license when she was a teenager; that her license had been renewed without further testing (she was age 31 at the time of this accident); that in December 1994, the date of this accident, she did not need or wear glasses; and that the last time she had had her vision tested she had shown no significant visual impairment. The plaintiffs summarize the testimony of their expert on nighttime vision thus:
 "The undisputed testimony from Dr. Paul Olsen is that under the conditions of nighttime driving, a driver in [Mrs.] Moses's position, with no visual problems, could not have seen the trailer across her lane of travel in time to avoid the collision. Dr. Olsen explained that the normal and expected glare from the headlights from the [Tillis Trucking] tractor combined with the normal positioning of the low beam headlights[9] of the Suzuki would have prevented discovery of the obstruction until just an instant before the impact. In fact, Dr. Olsen testified that the fact [that] Mrs. Moses was able to react in time to apply her brakes at all (as indicated by the 12-foot skid mark leading up to the point of impact) upon becoming aware of the trailer across her lane, indicates that she would have been in the above-average range of recognition and reaction times for someone faced with such an emergency."
The court did not err in giving a charge on the sudden-emergency doctrine.
Mr. Pride was charged with leaving the scene of an accident and with vehicular homicide; a jury acquitted him. He argues that the circuit court erred in allowing evidence that gave the jury knowledge of the criminal charges but then refusing to allow evidence of the acquittal. Mr. Pride acknowledges that evidence of an acquittal is generally not admissible in a civil action, but argues that the doctrine of curative admissibility applies because improper evidence was admitted regarding his being charged with a crime, citing C. Gamble, McElroy's Alabama Evidence § 14.01 (5th ed. 1996). The two instances of which Mr. Pride complains, however, were just testimony by the investigating officers that they had given a videotape to, or had spoken to, the *Page 886 
district attorney. This does not indicate that Mr. Pride was charged. Moreover, the first instance was in response to a question by Mr. Pride's attorney, "What happened to the tape that you made?" Thus it was Mr. Pride who opened the door to the evidence he now complains of. The circuit court did not err in sustaining the plaintiffs' objection.
Mr. Pride argues that to permit the plaintiffs to sue him in this action violates his right under the Fifth Amendment to the Constitution of the United States and under Article I, § 9, of the Constitution of Alabama of 1901 not to "be twice put in jeopardy of life or limb" for the same offense. Mr. Pride raised this defense in his answer and he stated it as a ground for his pre-verdict and post-verdict motions for a judgment as a matter of law. It is thus presented for review.
Mr. Pride bases his argument almost entirely on United Statesv. Halper, 490 U.S. 435 (1989).[10] The Court in Halper did make the statement "[A] civil as well as a criminal sanction constitutes punishment when the sanction as applied in the individual case serves the goals of punishment." 490 U.S. at 448. However, Mr. Pride fails to acknowledge that this holding expressly applies only to civil sanctions sought by an agency of government, such as those sought in administrative proceedings:[11]
 "[N]othing in today's opinion precludes a private party from filing a civil suit seeking damages for conduct that previously was the subject of criminal prosecution and punishment. The protections of the Double Jeopardy Clause are not triggered by litigation between private parties. In other words, the only proscription established by our ruling is that the Government may not criminally prosecute a defendant, impose a criminal penalty upon him, and then bring a separate civil action based on the same conduct and receive a judgment that is not rationally related to the goal of making the Government whole."
United States v. Halper, 490 U.S. at 451 (footnotes omitted).
Mr. Pride argues that this action is analogous to a qui tam
action in which a private person brings a punitive action on behalf of a government. The Supreme Court of the United States foreclosed such an argument in a footnote to the second sentence quoted above. That footnote reads:
 "We express no opinion as to whether a qui tam
action, such as the one in [United States ex rel. Marcus v. Hess, 317 U.S. 537 (1943)], is properly characterized as a suit between private parties for the purposes of this rule. In contrast to the plaintiff in a private-attorney-general action, the private party in a qui tam action brings suit in the name of the United States and shares with the Government any proceeds of the action. 31 U.S.C. § 3730. In Hess, the Court assumed but did not decide that a qui tam action could give rise to double jeopardy. Since this assumption was not essential to the judgment in Hess, we consider the issue unresolved."
Halper, 490 U.S. at 451 n. 11 (emphasis added). Mrs. Moses's personal representatives did not file a qui tam action; they filed an ordinary civil action. They did not file the action in the name of the State, and the State will not receive *Page 887 
any of the proceeds. Therefore, the general rule applies, that is, the rule that a civil action does not implicate the Double Jeopardy Clause, even if punitive damages may be imposed that action.[12]
The defendants argue that the circuit court erred in denying a remittitur. They argue principally that the circumstantial and, they say, marginally persuasive value of the evidence makes a substantial punishment unjust; that the wrongdoing was slight, amounting only to negligence; and that the evidence developed at the hearing held pursuant to Hammond v. City of Gadsden,493 So.2d 1374 (Ala. 1986), showed that the defendants' lack of wealth makes the verdict unjustifiably high.
These arguments are premised, of course, on the principles developed in cases such as Hammond; Green Oil Co. v. Hornsby,539 So.2d 218 (Ala. 1989); and BMW of North America, Inc. v. Gore,517 U.S. 559 (1996).
At the Hammond hearing, the high side of the range of values given to Tillis Trucking's assets — its trucks and trailers — was about $500,000; the low-side value of its net worth was given in negative figures. However, Tillis Trucking also has $1,000,000 in liability coverage under a motor vehicle policy that its insurer agrees is applicable to the collision that caused the death of Mrs. Moses. This Court has held that on the question of excessiveness it is appropriate to consider a defendant's insurance, because the availability of insurance affects the degree to which the defendant will actually be punished.
 "The trial court did take notice of the obligation of Industrial Chemical's insurer to indemnify it to a fixed amount, and, obviously, considered the impact upon Industrial Chemical for its liability above and beyond the indemnification point. And we cannot say, upon complete review of the record, that the trial court erred in its determination."
Industrial Chem. Fiberglass Corp. v. Chandler, 547 So.2d 812,832 (Ala. 1988). See also Cherokee Elec. Coop. v. Cochran,706 So.2d 1188, 1195 (Ala. 1997); Killough v. Jahandarfard,578 So.2d 1041, 1047 (Ala. 1991).
Tillis Trucking also has a bad-faith action pending against its insurer on the theory that the insurer wrongfully failed or refused to settle this claim within the limits of the motor vehicle policy.[13] The plaintiffs urge us to consider this bad-faith claim as an additional asset of Tillis Trucking. InMutual Assurance, Inc. v. Madden, 627 So.2d 865 (Ala. 1993), the Court held that the circuit court had not erred in considering, on the question whether a punitive-damages award was excessive, the defendant doctor's "potential for recovering from the insurer the amount of the judgment against him that exceeds the amount of his insurance coverage." 627 So.2d at 866. However, in that case, "[t]he record indicate[d] that the trial court had before it considerable evidence upon which it could reasonably ascribe a present value to [the doctor's] potential claims." Id. The pendency of the bad-faith action by Tillis Trucking against its insurer cannot affect the remittitur here, because the bad-faith claim is too speculative for this purpose, is not shown to be supported by "considerable evidence," as the *Page 888 
claim in Madden was, and is shown to be subject to substantial countervailing evidence.
The plaintiffs further urge us to consider as another asset of Tillis Trucking a contract claim Tillis Trucking has filed against its same insurer on a second policy, a $1,000,000 general liability policy, issued to Tillis Trucking. Like the bad-faith claim on the admittedly applicable motor vehicle policy, this contract claim on the general liability policy is speculative and is not shown to be supported by "considerable evidence." Whether this motor vehicle collision would be covered under a general liability policy is one of the issues that makes this claim too speculative to be considered as an asset of Tillis Trucking for purposes of our review of the verdict for excessiveness.
Given the undisputed liability coverage of $1,000,000 and the fact that the highest estimate of Tillis Trucking's worth is $500,000, it appears that the highest judgment the defendants could reasonably be expected to pay would be a judgment for $1,500,000. Even this amount would apparently force the liquidation of Tillis Trucking and the sale of all of its assets to pay the judgment. In comparing the award in this case with the awards in recent cases in which this Court has affirmed wrongful-death judgments, we find this $7,000,000 award to be considerably higher than the awards in those cases. See CherokeeElec. Coop. v. Cochran, 706 So.2d 1188 (Ala. 1997) ($3,000,000 award for wrongful death by electrocution affirmed); LemondConstr. Co. v. Wheeler, 669 So.2d 855 (Ala. 1995) ($3,500,000 award for wrongful death from vehicular collision affirmed);Campbell v. Williams, 638 So.2d 804 (Ala. 1994) ($4,000,000 award in wrongful-death medical malpractice action affirmed);Killough v. Jahandarfard, 578 So.2d 1041 (Ala. 1991) ($2,500,000 award affirmed for wrongful death from the failure of a landlord to install smoke detectors as required by law); Alabama Power Co.v. Turner, 575 So.2d 551 (Ala. 1991) ($5,000,000 award remitted to $3,500,000 in electrocution case); Industrial Chemical Fiberglass Corp. v. Chandler, 547 So.2d 812 (Ala. 1989) ($2,500,000 award affirmed for each of two widows, based on wrongful-deaths from chemical fire); Black Belt Wood Co., Inc. v.Sessions, 514 So.2d 1249 (Ala. 1986) ($3,500,000 award affirmed in wrongful-death action arising from log falling off log truck);Deaton, Inc. v. Burroughs, 456 So.2d 771 (Ala. 1984) ($835,000 award affirmed for wrongful death in the collision of two tractor-trailer trucks); Estes Health Care Centers, Inc. v.Bannerman, 411 So.2d 109 (Ala. 1982) ($500,000 award affirmed for wrongful death from negligent care by a nursing aide).
Black Belt Wood, supra, another case of wrongful death caused by a logging truck, is most like the case before us. While theBlack Belt Wood opinion reveals that all the stock of the defendant corporation was owned by one man, the opinion does not reveal the paucity of assets the evidence shows in the case before us. Thus, we do not view our approval of the $3,500,000 judgment in Black Belt Wood as militating against our remitting the judgment in this case to a sum below $3,500,000.
Finally, the defendants argue (and insist on application for rehearing) that it is unconstitutional to apply the Alabama Wrongful Death Act, Ala. Code 1975, § 6-5-410(a), as it has always been applied. That section provides:
 "(a) A personal representative may commence an action and recover such damages as the jury may assess . . . for the wrongful act, omission, or negligence of any person, persons, or corporation, his or their servants or agents, whereby the death of his testator or intestate was caused, provided the testator or intestate could have commenced an action for such wrongful act, omission, or negligence if it had not caused death."
(Emphasis added.)
From the time the Legislature enacted the predecessor of this provision in 1852, *Page 889 
this Court has understood the legislative intent behind the phrase "such damages as the jury may assess" to be that the jury is to award punitive or exemplary damages. In Campbell v. Williams, supra, 638 So.2d at 807-11, this Court recounted the history of this act and its application in the courts of this state and rejected constitutional challenges that are virtually indistinguishable from the ones made in these appeals. We refer the reader to that discussion generally, but we set forth the following excerpt:
 "We note that Alabama has historically treated actions resulting in death differently from actions causing lesser injury. The `enormity of the wrong' justifies the difference in treatment. The Alabama legislature, beginning in 1852, first sought `to prevent homicides' by the enactment of a wrongful death statute. By allowing punitive damages to be assessed against multiple defendants in wrongful death actions without apportionment based upon the degree of culpability of each, the legislature is `attempt[ing] to preserve human life by making homicide expensive.' Louis Pizitz Dry Goods Co. [v. Yeldell, 274 U.S. 112, 116 (1927)]. Participation in actions causing the death of a human being, even if slight, can result in liability without regard to the degree of culpability, and this result, the legislature believes, will lead to greater diligence in avoiding the loss of life. The legislature has authorized the jury to ascertain an amount of damages appropriate to the goal sought to be achieved — preservation of life because of the enormity of the wrong, the uniqueness of the injury, and the finality of death. Where the enormous wrong results from the combined actions of several tort-feasors, the relative culpability of multiple defendants is only one factor that the jury may consider. Because the policy of this state is to regard human life as being beyond measure in terms of dollars, the jury must disregard the decedent's wealth or lack of wealth, it must disregard the decedent's potential for accumulating great wealth or lack of potential to accumulate wealth; and it must disregard his or her talents and education, or lack of them, as well as his or her station in life. The jury's consideration of the `enormity of the wrong' includes assessing the finality of death, the propriety of punishing the wrongdoer or wrongdoers, whether the death could have been prevented, and, if so, the lack of difficulty that would have been involved in preventing the death, as well as the public's interest in deterring others from committing the same or similar wrongful conduct. Deaton, Inc. v. Burroughs, [456 So.2d 771, 776 (Ala. 1984)."
Campbell v. Williams, 638 So.2d at 810-11 (emphasis added).
Similar challenges have been rejected in other recent cases.Alabama Power Co. v. Turner, 575 So.2d 551 (Ala. 1991); CentralAlabama Elec. Coop. v. Tapley, 546 So.2d 371 (Ala. 1989);Industrial Chem. Fiberglass Corp. v. Chandler, 547 So.2d 812
(Ala. 1988). In Lemond Construction Co. v. Wheeler,669 So.2d 855 (Ala. 1995), the majority declined to address a constitutional challenge, stating that "Lemond's argument on this issue lacks the specificity required in order for this Court to address it." 669 So.2d at 863 (citations omitted). Concurring specially, Justice Maddox noted the following:
 "When the Legislature considered major `tort reform' legislation in 1987, it elected not to change the law of Alabama in wrongful death actions, such as this one, not involving a health care provider. The Legislature has elected not to change the law that only punitive damages can be awarded in wrongful death actions. Neither has the Legislature seen fit to change the law of Alabama regarding the nonapportionment *Page 890 
of punitive damages among joint tort-feasors. . . .[14]"
669 So.2d at 864. See Ala. Code 1975, § 6-11-29.
The only basis on which these recent cases might be questioned is the decision of the Supreme Court of the United States in BMW v. Gore, supra. However, this Court in CherokeeElec. Coop. v. Cochran, 706 So.2d 1188 (Ala. 1997), was able to conduct a meaningful review of a wrongful-death punitive-damages award, and we have done so here.
In Cherokee Electric, supra, the Court applied the three BMWv. Gore "guideposts," as well as the Hammond and Green Oil
principles of review, and affirmed a $3,000,000 wrongful-death judgment on a verdict in an electrocution case. As to the ratio of punitive damages to compensatory damages, the Court stated: "Alabama law allows no compensatory damages in a wrongful death case. This factor, therefore, does not apply here." 706 So.2d at 1194. Alternatively, one could say that it does not apply as a mathematical ratio, but, if one considers the purpose behind this factor, it applies in the sense of proportionality between the punitive-damages award and the harm that was caused or was likely to be caused by the defendants' conduct. Certainly, the likelihood of death to a driver of a passenger automobile is great in the case of collision with a tractor-trailer truck fully loaded with logs and weighing approximately 90,000 pounds. Certainly, death is a great harm. Whether we say that the ratio factor does not apply, as we said in Cherokee Electric, or that it applies in principle without mathematical application, the first "guidepost" from BMW v. Gore does not require this Court to overturn more than a century of precedent based on law awarding only punitive damages in wrongful-death actions.
In applying the "reprehensibility" factor, the Court stated in Cherokee Electric:
 "The jury found that it was reasonably foreseeable that members of the public could come into contact with Cherokee's 7,200-volt electric distribution line and that such contact could cause severe personal injury or death. Because a state can make homicide expensive, we hold that Cherokee's conduct was sufficiently reprehensible, in law, to support the jury's verdict awarding $3 million in punitive damages."
706 So.2d at 1194. Similarly, it is reasonably foreseeable that negligent or wanton operation of 90,000-pound logging trucks without adequate attention to safety procedures and maintenance could cause collisions with vehicles driven by members of the motoring public who would be likely to suffer severe personal injury or death as a result of the collisions. This factor does not support changing the law of wrongful death in this State.
As to the factor of "Similar Civil and Criminal Sanctions," 706 So.2d at 1194, the Court stated in Cherokee Electric: "Alabama law does not impose specific limits on the amount that may be recovered in wrongful death actions like this one, but we have considered how the award of punitive damages in this case compares with awards affirmed in other wrongful death cases this Court has reviewed." Id. We have done that above, and we find that the $7,000,000 award in this case is higher than other awards that have been affirmed on appeal; for this reason and for other reasons, we order a remittitur.
We see nothing in BMW v. Gore that should cause us to revisit the long-standing conclusion that the legislatively authorized action for wrongful death is intended to *Page 891 
punish the wrongdoer and the long-standing rule that the phrase "such damages as the jury may assess" is to be interpreted in light of that purpose. The Legislature declined in 1987 to disturb the 135-year-old application of that law; it affirmatively declined to amend that law when it otherwise enacted tort reform legislation to affect punitive-damages awards in actions other than actions based on wrongful death. The Supreme Court of the United States declined to disturb the statute, as applied, in Louis Pizitz Dry Goods Co.v. Yeldell, 274 U.S. 112, 116 (1927). We are not persuaded that it would do otherwise now, or that there is any other reason to overrule both recent and time-honored cases that have applied this interpretation of the statute.
For the reasons stated above, the judgment is affirmed, conditioned upon the plaintiffs' filing a remittitur of the award to $1,500,000 within 28 days of the release of this opinion; if such a remittitur is not filed by the plaintiffs within that time, the judgment will be reversed and this cause will be remanded for a new trial. American Pioneer Life Ins. Co. v. Williamson,704 So.2d 1361, 1367 (Ala. 1997).
APPLICATION FOR REHEARING GRANTED; OPINION OF JANUARY 8, 1999, WITHDRAWN; OPINION SUBSTITUTED; AFFIRMED CONDITIONALLY.
Hooper, C.J., and Maddox, Cook, Lyons, Brown, Johnstone, and England, JJ., concur.
Houston and See, JJ., concur in the result.
[1] Cynthia Diane Moses was the wife of Malachi Moses and the daughter of the Hortons.
[2] The plaintiffs also sued Tillis Land and Timber Company, but the jury returned a verdict in favor of that defendant.
[3] The defendants complain that the survey was done in 1996, after Hurricane Opal had passed through the area. The dirt road had been regraded and apparently widened by one or two feet, but there is no indication that this fact significantly affected the topography as it was shown in the animation and in a scale model that was used by all parties at trial.
[4] The Supreme Court of Florida "quashed" or reversed Pierce v.State. See State v. Pierce, 686 So.2d 572 (Fla. 1996):
[5] In addition to the discussion appearing later in this opinion, we note that this argument presents no error because the animation was shown in two versions, one with both headlights burning and the other with only the left headlight burning. The plaintiffs' expert on nighttime-vision effects testified that, if both headlights had been working, the glare would have been twice as great and the trailer would have been less visible.
[6] The question of driver's safety inspections, and Tillis Trucking's supervision of such inspections, were significant issues at trial because of the evidence indicating that certain lights on Mr. Pride's truck were not working. For example, the plaintiffs submitted into evidence a stack of "Driver's Inspection Reports" on which Tillis Trucking's drivers had perfunctorily checked a box indicating "No Defects" or had uniformly written "OK" under each category of inspections. Tillis Trucking gave each driver one such report to complete each day, even though the driver would haul three or four different trailers during the day.
[7] Actually, it was on redirect examination, but, because Mr. Hayes was an employee of Tillis Trucking, it was effectively cross-examination.
[8] The skid mark from the Suzuki was 12 feet long; it began 12 inches to the right of the center line and ended 6 to 8 inches to the right of the center line. The defendants make much of the fact that the investigating officers did not see this skid mark when they first arrived, but the evidence would support a finding that it was seen only later in the day because it became more visible when the sun rose higher.
[9] The evidence indicated that the low beams of the Suzuki were burning at the time of the collision, but not the high beams. This would be the correct procedure for two vehicles approaching each other.
[10] Mr. Pride also cites Ex parte State Alcoholic BeverageControl Bd., 654 So.2d 1149 (Ala. 1994), and United States v.Mayers, 897 F.2d 1126 (11th Cir. 1990). Both of those cases rely entirely on Halper and also pertain to civil sanctions sought by an entity of government, as discussed later in this opinion.
[11] Moreover, even that holding has been "disavow[ed]" inHudson v. United States, 522 U.S. 93, 94,118 S.Ct. 488, 139 L.Ed.2d 450 (1997). In Hudson, the Court held that "the Double Jeopardy Clause of the Fifth Amendment is not a bar to the later criminal prosecution because the administrative proceedings were civil, not criminal." Id.
[12] Moreover, Mr. Pride's argument proves too much. Most crimes are intentional acts. A tort action based on the same conduct would, therefore, allege an intentional tort (for example: the crime of assault, the tort of assault and battery; the crime of theft, the tort of conversion). Intentional torts ordinarily carry punitive damages, if the jury chooses to award them. According to Mr. Pride's argument, however, any person who has been prosecuted for a crime is thereby immune from an award of punitive damages in a civil action filed by his victims. That has never been, and is not, the law.
[13] This same action also includes theories of breach of contract, negligence, and wantonness in failing or refusing to settle within policy limits. We refer to the action as a "bad-faith action" for brevity and clarity.
[14] Part of the defendants' argument here is that joint and several liability is unconstitutional. Such arguments were rejected in Campbell v. Williams, supra, and we see no need to repeat that analysis here. See Bell v. Riley Bus Lines, 257 Ala. 120,57 So.2d 612 (1952), affirming the granting of a new trial based on the jury's apportionment of damages between two joint tortfeasors.