814 So.2d 808 (2001)
Gloria J. NICHOLS-BANKS, Appellant,
v.
LENSCRAFTERS and Liberty Mutual Insurance Company, Appellees.
No. 2000-WC-01510-COA.
Court of Appeals of Mississippi.
December 18, 2001.
Rehearing Denied April 23, 2002.
J. Peyton Randolph, II, Jackson, John David Garner, Attorneys for Appellant.
Donald V. Burch, Arthur S. Johnston, III, Bo Roland, Jackson, Attorneys for Appellees.
Before KING, P.J., BRIDGES, and IRVING, JJ.
IRVING, J., for the Court.
¶ 1. Gloria Nichols-Banks suffered a work-related injury to her lower back while employed at Lenscrafters. As a result of the injury, she filed a petition to controvert with the Mississippi Workers' Compensation Commission (the Commission). In the petition, she sought compensation for permanent partial disability. The administrative law judge, appointed to hear the allegations of the petition, ordered *809 temporary total disability from the date of the accident (July 11, 1997) until October 2, 1998, but denied the request for permanent partial disability. The full Commission affirmed the administrative law judge, and Nichols-Banks appealed to the Circuit Court of Madison County. The circuit court's affirmance of the Commission has resulted in this appeal by Nichols-Banks. She argues that the decision denying permanent partial disability is unsupported by substantial evidence and unwarranted by existing law. We agree; therefore, we reverse that portion of the Commission's order denying permanent partial benefits and enter judgment here for permanent partial benefits but remand to the Commission for a determination of the amount.

FACTS
¶ 2. Nichols-Banks worked at Lenscrafters as stocker and lab technician. On July 11, 1997, while checking in shipments, she tripped over a box, slid, and fell on her left side to the tiled concrete floor. She was taken to Methodist Convenient Care Clinic where she saw Dr. Massie Headley. An x-ray of her hip was taken, and she was given medicine for pain and muscle spasms. She was absent from work for about three days. When she returned to work, she was assigned to checking in frames and lenses. This assignment allowed her to sit while performing her duties.
¶ 3. On July 15, 1997, she returned to the Methodist Convenient Care Clinic and saw Dr. Headley again. She was given a pain injection. On or about August 11, 1997, she had a second injection and started physical therapy upon the recommendation of Dr. Headley. She testified that she was supposed to go back to work the day she started physical therapy but that Dr. Headley medically excused her from work for two weeks of physical therapy.[1] She was seen by a physical therapist at Methodist Hospital on August 11, 13, and 15, 1997. However, during her third visit to the physical therapist, she was told by the therapist that she was not responding well to the treatment and that she should go back to see a doctor.
¶ 4. Nichols-Banks saw her family physician, Dr. Wesley Granger, on August 26, 1997. She did not recall how many times she had seen him. Nevertheless, he referred her to Dr. David Gandy. Dr. Gandy's medical records were introduced into evidence. These records show that he examined her on October 8, 1997, for complaints of pain in the hip and lower back. He diagnosed her with questionable sacroiliac joint (SI joint) disruption and ordered a lumbar MRI to see if it showed the SI joint. After the MRI was done, Dr. Gandy noted that it was negative. He ordered a bone scan to further investigate the SI joint. The "bone scan showed only some faint diffuse activity in the right foot and ankle most likely related to alteration weight bearing due to painful left foot." He released her to light-duty work on December 18, 1997.
¶ 5. Nichols-Banks asked Dr. Gandy for a second opinion from Dr. Robert McGuire. Dr. Gandy thought that was a reasonable request and attempted to arrange an appointment with Dr. McGuire. Apparently, there was some difficulty in getting the approval to see Dr. McGuire at that time. However, Dr. Gandy rescinded his permission to return to work and referred her to Dr. Lon Alexander, a neurosurgeon, for an evaluation.
¶ 6. Dr. Alexander referred her to Dr. Jeffery Summers, a pain management specialist, *810 and to Dr. Vohra, a physical medicine rehabilitation specialist. However, the employer's carrier did not approve this referral since Dr. Alexander was not Nichols-Banks's treating physician. Nichols-Banks was then referred by Dr. Gandy to Dr. Robert Smith, a neurosurgeon.
¶ 7. Dr. Smith saw Nichols-Banks on March 2, 1998. She presented a history of having tripped over a box and falling, striking the side of her body. She explained that she was sore and tender for a few days and began having sharp pains in her lower back and left hip. She further advised that sometimes the pain radiated down to the left side of the foot. She also told Dr. Smith that she had a jammed SI joint and had two injections for it that helped for a while. She complained of the pain being more severe then than it was earlier. She was taking medication for pain and nervous disorders. She was also taking a muscle relaxer medication.
¶ 8. Dr. Smith conducted a neurological examination of her relating to the back and legs. This examination consisted of palpation of her spine and entire back down to the gluteal muscles, conducting the straight leg raising test and reflex examination, testing the muscle groups relating to the spine that extend to the legs, testing the hip joints, and testing for sensation. The examination did not reveal any spasm in the back or any significant loss of motion. The lordotic curvature was good, and there was no evidence of scoliosis. The straight leg raising test was normal. The reflex examination was normal with no pathological reflexes being noted. Motor testing did not discover any weaknesses, and the sensory examination for pain, touch, temperature and vibration was normal. The Fabere's test was negative with no atrophy or fasciculation indicated. However, she was tender at the L 5, S 1, and there was some restriction of the left at 85 degrees causing hip pain. Dr. Smith concluded that "there was no compelling neurological or mechanical findings to suggest significant lumbar back disease" and released her to "light productive work."
¶ 9. Dr. Smith testified that he was not sure whether he had ever seen a patient with an SI joint problem that required anything special in the way of treatment, that SI joint problems were rare. He testified that SI joint syndrome was not a "clearly defined medical syndrome" and this is a diagnostic nomenclature that doctors utilize for pain over the SI joint. He explained that he rarely made that diagnosis because:
[I]t's rarely [sic] that anything that ever goes wrong with that joint. It's practically a joint that does not move, and, therefore, it is not usually a tender joint. I am aware that there are several people who say that there is a condition referred to as SI joint syndrome.
Dr. Smith further testified that he did not think that a surgical procedure would be medically reasonable and necessary in regard to the problem, if any, that Nichols-Banks was having with her SI joint but that he would be "pleased to check her again and look at that possibility." However, he reiterated that, based on his examination of her, he did not think that there were indications for that kind of problem.
¶ 10. The next physician Nichols-Banks visited was Dr. Audrey Tsao, an orthopedic surgeon. Nichols-Banks came, without being referred by any physician, to see Dr. Tsao for a second opinion regarding her condition. Dr. Tsao saw Nichols-Banks for the first time on February 25, 1998. At that time Nichols-Banks complained of "discomfort and pain on her left hip, back, and buttock area." According to Dr. Tsao, Nichols-Banks "was on a cane or crutches almost all the time and had a *811 significant limp." Dr. Tsao examined Nichols-Banks and concluded that the bulk of Nichols-Banks's symptoms, at the time Nichols-Banks came to see her, stemmed from "iliotibial band tendinitis and bursitis." Dr. Tsao testified that after she had gotten Nichols-Banks's "iliotibial band tendinitis and bursitis under control," she began to feel that Nichols-Banks's left SI joint was the predominant problem. Dr. Tsao treated Nichols-Banks with medication and intra-articular injections and, on March 11, 1998, referred her to Dr. Brian Tsang, a pain anesthesiologist specialist, for the SI joint problem.
¶ 11. Nichols-Banks was seen on April 17, 1998, by Dr. McGuire, an orthopedic surgeon, who worked with Dr. Tsao. Dr. McGuire did not testify in this case. His medical report was admitted into evidence as a part of the medical records of the University Orthopaedic Associates. His examination of her revealed that she was "exquisitely tender over the left SI joint, somewhat out of proportion to what would be expected." According to the report, radiographs "of the SI joint on the left show sclerosis on the ilial side with what appears to be a vacuum sign." His impression of Nichols-Banks was that she suffered from SI arthritis.
¶ 12. Dr. Tsao continued to see Nichols-Banks while Nichols-Banks was being treated by Dr. Tsang who was administering SI joint injections to Nichols-Banks. Dr. Tsao saw Nichols-Banks on May 1 and 27, 1998. On May 1, Nichols-Banks had received her first SI joint injection from Dr. Tsang. According to Dr. Tsao, the visit on May 27 was just a verbal check to see how Nichols-Banks's SI joint dysfunction was doing. At this time, Nichols-Banks reported that the injections had provided only temporary relief from the pain and discomfort. Dr. Tsao advised her to continue seeing Dr. Tsang to see if he could control her pain. Nichols-Banks's next visit with Dr. Tsao was July 15, 1998. At this time, Nichols-Banks wanted to know if Dr. Tsao could recommend something which might give some permanent relief from the pain. Dr. Tsao advised that the only thing that she could think of was a medical procedure called sacroiliac joint fusion but that she did not perform that procedure. She advised Nichols-Banks that Dr. McGuire performed this procedure and referred her to him.
¶ 13. Dr. Tsao's last visit with Nichols-Banks was October 2, 1998. Dr. Tsao testified that at that time, Nichols-Banks was "as good as she's going to be, short of getting the SI joint fusion." Dr. Tsao deferred to Dr. McGuire an assessment as to whether Nichols-Banks would realize some improvement after having the procedure, assuming she decided to have the procedure done. Dr. Tsao was asked about physical limitations and restrictions that Nichols-Banks would suffer after October 2, 1998.
A. At the current time, she's still using a cane and/or crutches full-time. She's unable to sit for prolonged periods of time. She's unable to walk for prolonged periods of time. Basically she is unable to stay in one position.
Q. Okay. And, Doctor, how is her ability or-to stand for any length of time?
A. Very poor.
Q. Okay. What about, Doctor, walking stairs?
A. I would say that if she was in a situation where she had no choice, she could probably manage them, but they are to be avoided.
Q. Okay. What about standing on hard surfaces?
A. That's to be avoided also.

*812 Q. Uneven surfaces?
A. That's also to be avoided.
Q. Any restrictions on lifting or carrying?
A. I don't think she can lift or carry anything since she's using crutches.
¶ 14. On cross-examination, Dr. Tsao testified that she did not prescribe the crutches for Nichols-Banks.[2] During further cross-examination, Dr. Tsao explained why she felt Nichols-Banks suffered from SI joint dysfunction.
Q. Do youin the course of your studies and the tests that you did of her, do you have any positive objective findings to demonstrate an actual injury to the SI joint?
A. The injections, when they relieve complete pain, are diagnostic as well as therapeutic, and Dr. Tsang's report states that.
Q. But you've neverno one has ever demonstrated any fractures in that area, have they?
A. No.
Q. And I think the bone scans that were done have all been reported as normal, is that
A. That's correct.
Q. So that means there's no damage to the bone?
A. No, that means that the bone scan is not hot or active.
Q. Okay. And you would expect it to be hot or active if it had received trauma to it; there would be uptake of the bone there?
A. Not necessarily.
Q. Why would it not be?
A. Bone scan only shows an increased hyperemia, increased blood flow to the area. You can have an area of injury that does not necessarily have activity that is large enough to be seen on a bone scan.
Q. Okay. Well, whatwhat would a fusion to that area correct or cure?
A. Mobilethe sacroiliac joint can be irritated by too much mobility and inflammation of the synovial joint of that area.
Q. Okay. Is there
A. So a fusion limits the motion and takes away that synovial joint.
Q. Is there any positive evidence that she has excessive motion in that joint or any of these other conditions?
A. Her injections.
Q. That's the only thingthe only basis that you have for that?
A. Yes.
Q. Okay. And pain, of course, is completely subjective; is it not? You have no way of measuring the amount of pain that this lady has?
A. That's correct.
Q. I believe you said you also had her evaluated by Dr. Robert McGuire here at the University?
A. I did.
Q. And I believe his report of April 17th of '98I know that it was probably given to youindicated that all he could find there was some arthritis with no neurologic abnormality; is that correct?
A. Yes.

*813 Q. Did you have access to RobertDr. Robert Smith'sRobert R. Smith's report?
A. I have Dr. Granger's report. I do not have Dr. Smith's report.
Q. Bear with me just one moment. Doctor, in looking at the University's radiology report here of May the 5th of 1998, it says there's no radiographic abnormality in the claimant's SI joints. So, if there's no abnormality there, how is this going to be surgically corrected?
A. Can I see the report you're looking at? May the 5th. I have an April 17ththis is April 17th.
Q. Okay. That's the date it was dictated.
A. Yeah, April 17th. The radiologist has read this as normal. However, Dr. McGuire has read this as sclerosis of the SI joint with a vacuum sign. I feel that Dr. McGuire is correct.
Q. Okay. And you think the radiologist misread thehis x-ray?
A. I thinkI think that the treating physicians have a better ability to interpret the x-rays on this particular situation. This is a very difficult diagnosis to make.
Q. Okay. How many of these have you seen in your experience?
A. I see one every six months.
¶ 15. The next physician to see Nichols-Banks was Dr. Michael Herman Joseph Winkelmann, a specialist in internal medicine and physical medicine and rehabilitation. She was referred to him for an independent medical examination by the attorneys for Liberty Mutual Insurance Company. He examined Nichols-Banks on February 17, 1999. His impression was that Nichols-Banks suffered from "leftsided sacroiliitis." However, he "felt it was very difficult to ascertain the pathology secondary to her guarding." He also noted that Nichols-Banks had significant pain with internal rotation that would indicate the possibility of arthritic changes. Dr. Winkelmann testified that Nichols-Banks had "good mobility of her joints." In accordance with the American Medical Association Guidelines, he gave her a three percent permanent partial impairment rating. Based on his examination of her, he was unable to determine if work restrictions were warranted; he recommended that "a functional capacity evaluation" be done.

ANALYSIS AND DISCUSSION OF THE ISSUES
¶ 16. The findings of the Mississippi Workers' Compensation Commission are binding on the appellate court so long as they are supported by substantial evidence. Hedge v. Leggett & Platt, Inc., 641 So.2d 9, 12 (Miss.1994). An appellate court will reverse an order of the Commission only when such order is clearly erroneous and contrary to the overwhelming weight of the evidence. Id.
¶ 17. There is no issue as to whether Nichols-Banks suffered a compensable work-related injury. Likewise, it is not contested that she was totally disabled from July 11, 1997, until October 2, 1998. The only issue is whether she suffered any permanent disability. In determining that Nichols-Banks did not suffer any permanent disability, the administrative law judge stated:
The evidence as a whole does not support Ms. Nichols-Banks's claim of permanent occupational disability resulting from the work injury. Her appearance at the hearing on February 22, 1994, was a classic Academy-Award nomination performance by a claimant who is getting great secondary gain from being *814 "disabled." Her behavior was so exaggerated that it could not be believed. She acted as if she could barely talk because of her condition. Claimants who are truly disabled do not act like Ms. Nichols-Banks at hearing.
¶ 18. The administrative law judge further stated that "Dr. McGuire found Ms. Nichols-Banks to be exaggerating pain complaints during his examination on April 17, 1998, and Dr. Robert Smith could find nothing wrong with her on March 2, 1998." The administrative law judge continued her findings with the following conclusion:
Other than some degenerative problems in the SI joint which were apparently temporarily aggravated by the work injury of July 11, 1997, there is nothing significantly wrong with Ms. Nichols-Banks, and she needs to return to an active life and gainful employment. Lying in bed and taking narcotic medications can cause a person to feel genuinely disabled.
Even if the degenerative problems should restrict her to light-duty work, Ms. Nichols-Bank is perfectly capable of doing very good light or sedentary work. None of the physicians she has seen has restricted her from light work.
¶ 19. As stated, the full Commission affirmed the administrative law judge, and the circuit judge affirmed the Commission. Our review of the record reveals substantial evidence supporting the finding of the Commission that Nichols-Banks greatly exaggerated her complaints during her visits to the various physicians. All of the physicians, with the exception of Dr. Taso, seem to believe that Nichols-Banks was exaggerating to some extent. However, exaggeration of the symptoms of the complaint is not synonymous with the absence of the complaint. We do not find substantial evidence to support the Commission's finding that Nichols-Banks did not suffer any permanent disability. Dr. Winkelmann gave Nichols-Banks a three percent permanent partial impairment rating. This finding by Dr. Winkelmann is not contradicted by any other evidence in the record. Further, Drs. Tsao, McGuire and Winkelmann all concluded that Nichols-Banks, although she greatly exaggerated her pain, did suffer from SI joint dysfunction. No evidence was offered which could account etiologically for this condition; therefore, the fall cannot be ruled out as the culprit.
¶ 20. It is true that Dr. Smith did not find anything significantly wrong with Nichols-Banks but he did find that "she was tender at the L-5, S-1, and there was some restriction of the left at 85 degrees causing hip pain." Also, while he did not believe Nichols-Banks suffered from SI joint dysfunction, he did not emphatically say that there was no possibility that she could be suffering from this problem. Further, he admitted in his testimony that he rarely made this type of diagnosis and acknowledged that the condition is rare. On the other hand, Dr. Tsao testified that she sees this type condition once every six months. Additionally, it should be noted that Drs. Smith, McGuire and Winkelmann all saw and examined Nichols-Banks only once. Dr. Tsao treated her from February 1998 until October 1998.
¶ 21. We acknowledge that there is some, though not substantial, evidence to support the Commission's finding. However, because of the broad policy considerations undergirding the Workers' Compensation Act and the liberal construction to be given the compensation statutes, the injured worker should prevail even if the evidence were even. Metal Trims Indus., Inc. v. Stovall, 562 So.2d 1293, 1297 (Miss.1990). Accordingly, we reverse the decision of the circuit court affirming the Commission's denial of permanent *815 partial benefits to Nichols-Banks and award permanent partial benefits here but remand the case to the Commission for a determination of the degree of permanent disability.
¶ 22. THE JUDGMENT OF THE CIRCUIT COURT OF MADISON COUNTY IS REVERSED, PERMANENT PARTIAL BENEFITS ARE AWARDED HERE TO THE APPELLANT AND THE CASE IS REMANDED TO THE MISSISSIPPI WORKERS' COMPENSATION COMMISSION FOR A DETERMINATION OF THE DEGREE OF PERMANENT DISABILITY. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLEES.
KING, P.J., BRIDGES, LEE, CHANDLER AND BRANTLEY, JJ., CONCUR. SOUTHWICK, P.J., DISSENTS WITH A SEPARATE WRITTEN OPINION JOINED BY MCMILLIN, C.J., THOMAS AND MYERS, JJ.
SOUTHWICK, P.J., Dissenting:
¶ 23. With respect for the majority, I find that the Workers' Compensation Commission was within the discretion entrusted to it when it held that this claimant had not carried her burden of proof. Therefore, I would affirm.
¶ 24. The Commission by adopting Administrative Judge Linda Thompson's findings reached the conclusion that the evidence of a permanent loss of wage-earning capacity was slim and unconvincing. We must analyze whether this factual finding is supported by substantial evidence and assure ourselves that the Commission did not act in an arbitrary or capricious fashion. Mississippi Transp. Com'n v. Dewease, 691 So.2d 1007, 1016 (Miss.1997).
¶ 25. First, the Commission found that the claimant was falsely indicating physical problems at the hearing before the administrative judge. The majority is certainly correct that exaggerating symptoms does not remove the possibility of lesser problems. However, such acting does not invoke the non-legal maxim of "where there is smoke, there must be fire." There may be no fire behind the smoke, but only desire.
¶ 26. Next, the Commission found that the physician most supportive of the claim still acknowledged that no objective findings supported the complaints of pain. The claimant had used both crutches and a cane at various times since the injury, alleging that doctors had prescribed them, but there was no proof that either identified doctor had done so.
¶ 27. Another doctor found the claimant to be exaggerating her pain, while still another said that after examining her in early 1998 he could find nothing wrong with her. This last doctor assigned a three percent impairment rating, but the Commission through the findings that it adopted noted that it found even this diagnosis to be suspect because of the claimant's behavior.
¶ 28. What the Commission needed to decide is whether as a result of the injuries for which the employer was responsible, the claimant had suffered any permanent loss of wage-earning capacity. Even if there were some actual but minor continuing effects of the injury, the Commission could find that they did not reduce her wage-earning capacity. The Commission found the proof lacking that there was any permanent effect. I find no basis on which to reverse that finding.
McMILLIN, C.J., THOMAS, AND MYERS, JJ., JOIN THIS SEPARATE WRITTEN OPINION.
NOTES
[1] Her last day of work was on August 9, 1997.
[2] In her appellate reply brief, Nichols-Banks attached what appears to be a prescription for crutches written by Dr. Tsao. The date of the prescription is May 1, 1998. We decide issues based on documentation contained in the record, not briefs of counsel, and we do not find the prescription in the appellate record. Further, Dr. Tsao testified that she first saw Nichols-Banks on February 25, 1998.