Rel: 08/01/2014

**Notice:** This opinion is subject to formal revision before publication in the advance sheets of **Southern Reporter**. Readers are requested to notify the **Reporter of Decisions**, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 229-0649), of any typographical or other errors, in order that corrections may be made before the opinion is printed in **Southern Reporter**.

# SUPREME COURT OF ALABAMA

## SPECIAL TERM, 2014

_____

### 1120292

_____

**Frank Gillis, M.D.**

**v.**

**Joey Frazier, as executor of the Estate of Florine Bryant, deceased**

_____

### 1121205

_____

**Frank Gillis, M.D.**

**v.**

**Joey Frazier, as executor of the Estate of Florine Bryant, deceased**

Appeals from Colbert Circuit Court
(CV-07-900030)

MAIN, Justice.

1120292 and 1121205

Frank Gillis, M.D., appeals from a $5,000,000 judgment entered on a jury verdict against him in favor of Joey Frazier, as executor of the estate of his mother, Florine Bryant, in this wrongful-death/medical-malpractice case. We affirm the judgment in case no. 1121205; we reverse and remand in case no. 1120292.

## I.  Facts and Procedural History

Bryant died on November 17, 2005.  On April 19, 2007, Frazier, on behalf of his mother's estate, sued Dr. Gillis, a family practitioner, and Carol Davis, a certified nurse practitioner,[1] alleging wrongful death/medical malpractice stemming from care rendered to his mother while she was taking the drug Coumadin.  Dr. George A. Evans, who had treated Bryant while she was hospitalized in the days before her death because Dr. Gillis was out of town, was subsequently named as a defendant.[2]

---

[1] Frazier and Davis entered into a pro tanto settlement in September 2009.

[2] Frazier added Dr. Evans as a defendant in February 2009. Dr. Evans filed a motion for a summary judgment, asserting that the claims against him were barred by the statute of limitations for medical malpractice.  The trial court granted Dr. Evans's summary-judgment motion.

2

The case against Dr. Gillis was first tried in October 2010. At the close of Frazier's case, Dr. Gillis moved for a judgment as a matter of law ("JML"), arguing that his alleged negligence was not the proximate cause of Bryant's death. In particular, Dr. Gillis argued that the deficient medical treatment Bryant received at the hands of other health-care providers was the proximate cause of Bryant's death and that, but for that intervening cause, Bryant would have survived. The trial court entered a JML in Dr. Gillis's favor. Frazier appealed to this Court, and we transferred the appeal to the Court of Civil Appeals pursuant to § 12-2-7(6), Ala. Code 1975.

The Court of Civil Appeals reversed the trial court's judgment and remanded the case for a new trial, holding that the trial court had erred in entering a JML for Dr. Gillis because, the court reasoned, although the treatment provided Bryant by other health-care providers was an "intervening cause," it did not absolve Dr. Gillis of liability. Frazier v. Gillis, 85 So. 3d 443, 453 (Ala. Civ. App. 2011). Dr. Gillis filed a petition for a writ of certiorari with this Court, which was denied on December 9, 2011.

3

The case was retried in June 2012. The evidence showed that on August 29, 2005, Dr. Gillis diagnosed Bryant with atrial fibrillation and prescribed a blood thinner, Coumadin. At trial, Dr. Gillis explained that Coumadin requires that patients be monitored to ensure that their blood does not become too thin. The evidence showed that on August 31, 2005, Bryant's international normalized ratio ("INR") level was 1.9, which was within the normal therapeutic range.

On September 7, 2005, Bryant returned to the lab to have her INR level checked. Bryant's blood was drawn that day; however, no INR test was administered. Instead, Bryant's INR was not checked again by Dr. Gillis's office until November 14, 2005.

On November 14, 2005, Bryant's blood was drawn, and her INR level was 34.2. Because Dr. Gillis was out of town, his nurse practitioner, Davis, instructed Bryant to discontinue the Coumadin. Davis told Bryant to return on November 18, 2005, to have her INR level checked.

Bryant returned to Dr. Gillis's office the next day, November 15, 2005, complaining of nausea, a headache, and bleeding from the site where her blood had been drawn the day

4

before. Davis ordered another INR test. The results indicated that Bryant's INR level was 44.77.[3] Davis took the INR test results to Dr. Evans, who was handling Dr. Gillis's patients while Dr. Gillis was out of town. Dr. Evans instructed Davis to refer Bryant to a hematologist. Davis did so and told Bryant that if she had any problems she was to go to the hospital.

Bryant suffered a massive brain hemorrhage and was found unresponsive on the morning of November 16, 2005. Bryant was transported to the hospital, where it was noted that laboratory studies revealed profound abnormalities and a large subdural hematoma. Bryant was removed from life support on November 17, 2005.

At the conclusion of the retrial of the case, the jury awarded Frazier $5,000,000 in damages for the wrongful death of his mother. Dr. Gillis filed a motion seeking, alternatively, a JML, a new trial, or a remittitur of the damages award. Dr. Gillis argued that the jury's verdict was unsupported by the evidence and that it was motivated by

---

[3]There was a note attached to the results of the INR test indicating that Bryant's INR level was actually .89 because a "mixing study" had been done. The record does not explain the term "mixing study."

5

sympathy or bias.  He contended that, in the absence of a new trial, he was due, under the guideposts set forth in BMW of North America, Inc. v. Gore, 517 U.S. 559 (1996), and the factors set out in Hammond v. City of Gadsden, 493 So. 2d 1374 (Ala. 1986), and Green Oil Co. v. Hornsby, 539 So. 2d 218 (Ala. 1989), a remittitur of the jury's punitive-damages award based on its alleged excessiveness.  Dr. Gillis argued that his age, 76, and his inability to pay $3,000,000 of the judgment -- the amount above his liability-insurance coverage of $2,000,000 --  supported a remittitur of the damages award. Dr. Gillis also filed a renewed motion to revive § 6-5-547, Ala. Code 1975, which this Court has held to be unconstitutional, see Smith v. Schulte, 671 So. 2d 1334 (Ala. 1995), and a motion seeking an order striking any damages awarded in excess of the $1,000,000 cap proscribed in § 6-5-547.

The parties engaged in posttrial discovery.  Frazier sought information regarding Dr. Gillis's financial condition. Specifically, Frazier requested the production of evidence related to a potential bad-faith claim by Dr. Gillis against his liability-insurance carrier, ProAssurance Indemnity

6

Company, Inc. ("ProAssurance"). ProAssurance produced certain documents from its claim file for in camera review by the trial court. ProAssurance withheld certain other documents and filed a privilege log of documents not disclosed. The trial court conducted an evidentiary hearing and subsequently denied Dr. Gillis's postjudgment motions. On December 7, 2012, Dr. Gillis appealed.

After Dr. Gillis filed his appeal from the trial court's denial of his postjudgment motions (case no. 1120292), Dr. Gillis asked this Court for permission to file a motion with the trial court for relief from the trial court's judgment under Rule 60(b), Ala. R. Civ. P. Frazier opposed Dr. Gillis's motion. On March 5, 2013, this Court entered an order staying the appeal and allowing Dr. Gillis to file a Rule 60(b) motion in the trial court. On June 4, 2013, this Court remanded the case to the trial court for the limited purpose of conducting a <u>Hammond/Green Oil</u> hearing concerning the jury's punitive-damages award.

On June 20, 2013, the trial court denied Dr. Gillis's Rule 60(b) motion as time-barred under Rule 60(b)(2) and, under Rule 60(b)(6), as lacking a showing that Dr. Gillis "did

7

1120292 and 1121205

everything within his power" to discover the information supporting his motion before the judgment became final. Specifically, the trial court held:

"2. Gillis is not entitled to any relief from the judgment under Rule 60(b)(2) because: (1) Gillis has failed to establish that, through the exercise of due diligence, he could not have discovered the information upon which his motion is based in time to file a Rule 59 motion; and (2) Gillis is time-barred from obtaining relief under this subsection because he failed to request any relief pursuant thereto within four months of the initial entry of judgment.

"3. Gillis is not entitled to any relief under Rule 60(b)(6) because he has not established that he did everything reasonably within his power to discover the information upon which his motion is based and obtain relief from the verdict before the judgment entered thereon became final.

"4. Gillis's motion also represented an impermissibly remote attack on the jury...[because he] continued to investigate the private lives, and apparently the private medical records, of the jurors and their families for more than nine months following their verdict."

On July 11, 2013, Dr. Gillis filed a second notice of appeal to this Court, appealing the trial court's denial of

8

1120292 and 1121205

his Rule 60(b) motion (case no. 1121205).[4]    On October 1, 2013, this Court consolidated the two appeals.[5]

## II.  Analysis

### A.  Case no. 1121205 -- Rule 60(b) Order

Dr. Gillis, in case no. 1121205, appeals from the trial court's denial of his motion for relief from judgment under Rule 60(b), Ala. R. Civ. P.  Dr. Gillis sought leave from this Court to seek relief under Rule 60(b) from the trial court's judgment.  See Rule 60(b), Ala. R. Civ. P. ("Leave to make the motion need not be obtained from any appellate court except during such time as an appeal from the judgment is actually pending before such court.").  This Court granted Dr. Gillis's motion.  Rule 60(b), Ala. R. Civ. P.,  provides:

> "On motion and upon such terms as are just, the court may relieve a party or a party's legal representative from a final judgment, order, or proceeding for the following reasons: (1) mistake, inadvertence, surprise, or excusable neglect; (2) newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59(b); (3) fraud (whether heretofore denominated intrinsic or extrinsic), misrepresentation, or other misconduct of an adverse party; (4) the judgment is void; (5) the judgment

---

[4]We note that the trial court filed a return to remand in case no. 1120292 following the Hammond/Green Oil hearing.

[5]This case was assigned to Justice Main on March 25, 2014.

9

has been satisfied, released, or discharged, or a prior judgment upon which it is based has been reversed or otherwise vacated, or it is no longer equitable that the judgment should have prospective application; or (6) any other reason justifying relief from the operation of the judgment. The motion shall be made within a reasonable time, and for reasons (1), (2), and (3) not more than four (4) months after the judgment, order, or proceeding was entered or taken."

A Rule 60(b)(2) motion must be brought within four months of the judgment that it seeks to have set aside. "'Newly discovered evidence' means evidence in existence at the time of trial of which the movant was unaware. ... And for a litigant to obtain a new trial on the ground of newly discovered evidence, it must appear that his reasonable diligence before trial would not have revealed this evidence which he failed to discover." Moody v. State ex rel. Payne, 344 So. 2d 160, 163 (Ala. 1977). Under Rule 60(b)(2),

"'the burden is on the moving party to show that he has such "newly discovered" evidence and why through due diligence it was not discovered in time to seek a new trial under Rule 59, [Ala. R. Civ. P.].' Gallups v. United States Steel Corporation, 353 So. 2d 1169 at 1172 (Ala. Civ. App. 1978), citing Plisco v. Union R.R., 379 F.2d 15 (3d Cir. 1967). 'Motions to set aside judgments on the basis of newly discovered evidence are not favored.' Garland v. Garland, 406 So. 2d 415 (Ala. Civ. App. 1981); Hudson v. Hudson, 404 So. 2d 82 (Ala. Civ. App. 1981); Pace v. Jordan, 348 So. 2d 1061 (Ala. Civ. App. 1978). The grant or denial of a motion under

10

> Rule 60(b), [Ala. R. Civ. P.], is discretionary with the trial court and we will not disturb its judgment on appeal absent an abuse of that discretion. City of Daphne v. Caffey, 410 So. 2d 8 (Ala. 1981); Pierson v. Pierson, 347 So. 2d 985 (Ala. 1977); Garland v. Garland, supra; Hudson v. Hudson, supra."

Beaty v. Head Springs Cemetery Ass'n, Inc., 413 So. 2d 1126, 1128 (Ala. 1982).

Under Rule 60(b)(6), a party may seek relief from a judgment for any reason justifying relief other than those reasons enumerated in subsections (1) through (5). In R.E. Grills, Inc. v. Davison, 641 So. 2d 225 (Ala. 1994), this Court stated:

> "The 'catch all' provision of clause (6) of Rule 60(b) allows a trial court to grant relief from a judgment for 'any other reason justifying relief.' Barnett v. Ivey, 559 So. 2d 1082, 1084 (Ala. 1990). '"Relief under Rule 60(b)(6) is reserved for extraordinary circumstances, and is available only in cases of extreme hardship or injustice."' Chambers County Comm'rs v. Walker, 459 So. 2d 861, 866 (Ala. 1984) (quoting Douglass v. Capital City Church of the Nazarene, 443 So. 2d 917, 920 (Ala. 1983)). Clause (6), however, is mutually exclusive of the specific grounds of clauses (1) through (5), and a party may not obtain relief under clause (6) if it would have been available under clauses (1) through (5). See, e.g., Insurance Management & Admin., Inc. v. Palomar Ins. Corp., 590 So. 2d 209 (Ala. 1991); Barnett, 559 So. 2d at 1084; Smith v. Clark, 468 So. 2d 138, 140 (Ala. 1985); Chambers County Comm'rs v. Walker, 459 So. 2d 861 (Ala. 1984); Ex parte Hartford Ins. Co., 394 So. 2d 933, 935-36 (Ala. 1981); Rebel Oil Co. v. Pike, 473 So.

11

> 2d 529 (Ala. Civ. App. 1985); Charles Townsend Ford, Inc. v. Edwards, 374 So. 2d 900, 902 (Ala. Civ. App. 1979)."

641 So. 2d at 229.

> > "'Rule 60(b)(6) is an extreme remedy and relief under Rule 60(b)(6) will be granted only "in unique situations where a party can show exceptional circumstances sufficient to entitle him to relief." Nowlin v. Druid City Hosp. Bd., 475 So. 2d 469, 471 (Ala. 1985). The purpose of Rule 60(b)(6) is not to relieve a party from a free and deliberate choice the party has previously made. City of Daphne v. Caffey, 410 So. 2d 8, 10 (Ala. 1982).'"

Ex parte Phillips, 900 So. 2d 412, 419 (Ala. 2004) (quoting Wood v. Wade, 853 So. 2d 909, 912-13 (Ala. 2002)). A motion under Rule 60(b)(6) must be brought "within a reasonable time" after the entry of the judgment. Rule 60(b).

> > "'"What constitutes a 'reasonable time' depends on the facts of each case, taking into consideration the interest of finality, the reason for the delay, the practical ability to learn earlier of the grounds relied upon, and the prejudice to other parties. Adams v. Farlow, 516 So. 2d 528 (Ala. 1987), cert. denied, 485 U.S. 1010, 108 S.Ct. 1477, 99 L.Ed.2d 705 (1988). In addition, the doctrine of laches, which denies equitable relief to one guilty of unconscionable delay in asserting a claim,

> applies to Rule 60(b) motions. <u>Waldrop v. Waldrop</u>, 395 So. 2d 62 (Ala. 1981)."
>
> "'<u>Ex parte W.J.</u>, 622 So. 2d 358, 361 (Ala. 1993).'"
>
> "[<u>Ex parte</u>] <u>Hicks</u>, 67 So. 3d [877,] 880 [(Ala. 2011)]."

<u>Bates v. Stewart</u>, 99 So. 3d 837, 853 (Ala. 2012).

In his motion seeking leave from this Court to seek Rule 60(b) relief in the trial court, Dr. Gillis claimed that he was seeking relief alternatively under Rule 60(b)(2) and Rule 60(b)(6). When he filed his motion in the trial court, he requested relief under Rule 60(b); he did not specify the subsection under which he sought consideration. The trial court determined that Dr. Gillis was not entitled to relief under either Rule 60(b)(2) or Rule 60(b)(6).

Because Dr. Gillis's motion in the trial court does not specify any Rule 60(b) ground for relief, we must determine the nature of Dr. Gillis's motion. In his motion, Dr. Gillis alleged that he was entitled to relief from the judgment because a juror failed to reveal that her husband had been a former patient of Dr. Gillis's. In particular, Dr. Gillis claimed that the juror did not reveal: (1) that her husband

13

was a former patient of Dr. Gillis's and (2) that, as a result of that experience, she held a negative opinion of Dr. Gillis, did not like Dr. Gillis, and did not consider him to be a good doctor.

Initially, as the trial court concluded, if considered a Rule 60(b)(2) motion based on newly discovered evidence, Dr. Gillis's motion would be untimely because it was not filed within four months of the entry of judgment. Consequently, the motion would have to fall within Rule 60(b)(6) to be timely. Therefore, our inquiry is whether the motion can properly be considered a Rule 60(b)(6) motion asserting as a ground "any other reason justifying relief from the operation of the judgment."

We must consider whether Dr. Gillis had access to the information on the juror before the judgment became final so that, if Dr. Gillis had done everything reasonably within his power, he could have discovered the information at that time. "[R]elief [pursuant to Rule 60(b)] should not be granted to a party who has failed to do everything reasonably within his power to achieve a favorable result before the judgment becomes final; otherwise, a motion for such relief from a

14

final judgment would likely become a mere substitute for appeal and would subvert the principle of finality of judgments." Osbom v. Roche, 813 So. 2d 811, 818 (Ala. 2001). The record reflects that the trial court considered conflicting affidavits concerning the extent of Dr. Gillis's treatment of the juror's husband and whether the juror had ever spoken disparagingly about Dr. Gillis at any time. "'Without question, a movant must both allege and prove one of the grounds set forth in Rule 60 in order to be granted relief under that rule.'" Ex parte A&B Transp., Inc., 8 So. 3d 924, 932 (Ala. 2007) (quoting Ex parte Baker, 459 So. 2d 873, 876 (Ala. 1984)(emphasis added)). Given the conflicting evidence, we must conclude that Dr. Gillis failed to meet his "'burden of proving extraordinary circumstances and/or extreme hardship or injustice sufficient to entitle him to relief under Rule 60(b)(6).'" Id. Therefore, we affirm the judgment of the trial court in case no. 1121205.

B. Case no. 1120292

### 1. Remittitur Issue

Dr. Gillis next challenges, in case no. 1120292, the trial court's order denying his motion for a remittitur because, he says, in calculating Dr. Gillis's assets, the

15

trial court improperly included among his assets a potential bad-faith claim against his liability-insurance carrier, ProAssurance. Dr. Gillis asks this Court to overrule Boudreaux v. Pettaway, 108 So. 3d 486 (Ala. 2012), to the extent that it held that a potential bad-faith claim and/or negligent-failure-to-settle claim against a liability-insurance carrier may be considered as an asset for purposes of a Hammond/Green Oil review and a remittitur analysis.

We accept Dr. Gillis's invitation to overrule Boudreaux to the extent that it held that, in calculating a defendant's assets, the trial court may consider the contents of the claim file compiled by a defendant's liability-insurance carrier and include among the defendant's assets a potential bad-faith and/or negligent-failure-to-settle claim against the defendant's liability-insurance carrier. We conclude that allowing a trial court to consider a defendant's potential third-party claim against its liability-insurance carrier as an asset for purposes of a Hammond/Green Oil review and a remittitur analysis is subjective rather than objective. In a remittitur analysis, the actual assets and liabilities of the defendant are determinative of the defendant's net worth. A cause of action against a defendant's liability-insurance

16

carrier does not accrue until a final judgment has been entered against the defendant. Because at the time of a Hammond/Green Oil hearing the third-party action has not yet accrued and is speculative in nature, it cannot be considered as part of the defendant's net worth in determining a defendant's assets for purposes of Hammond/Green Oil and the remittitur analysis. Accordingly, we reverse the judgment as to this issue and remand this case for the trial court to conduct a Hammond/Green Oil hearing without taking into consideration Dr. Gillis's potential bad-faith and/or negligent-failure-to-settle claim against his liability-insurance carrier. We further direct that the trial court, in calculating Dr. Gillis's assets under Hammond/Green Oil, should not consider Dr. Gillis's wife's portion of their jointly owned assets.

2.  Section 6-5-547, Ala. Code 1975

Dr. Gillis urges this Court to revive § 6-5-547, Ala. Code 1975, which limited a judgment in a medical-malpractice action against a health-care provider to $1,000,000, and to overrule Smith v. Schulte, 671 So. 2d 1334 (Ala. 1995), which held that the cap on damages in § 6-5-547, Ala. Code 1975, was unconstitutional. In support of his argument, Dr. Gillis

17

1120292 and 1121205

cites Ex parte Apicella, 809 So. 2d 865 (Ala. 2001), and Ex parte Melof, 735 So. 2d 1172 (Ala. 1999).

This Court revisited the Schulte decision in Mobile Infirmary Ass'n v. Tyler, 981 So. 2d 1077 (Ala. 2007), and declined to revive § 6-5-547. After considering Schulte and its progeny and the cases cited by Dr. Gillis, we are not persuaded to overrule Schulte.

### III. Conclusion

We affirm the judgment of the trial court denying Dr. Gillis relief under Rule 60(b), Ala. R. Civ. P., in case no. 1121205. In case no. 1120292, we reverse the judgment insofar as it considered the potential bad-faith and/or negligent-failure-to-settle claim against Dr. Gillis's liability-insurance carrier and remand the cause. We decline to overrule Schulte and revive the statutory cap on damages in medical-malpractice actions. On remand, the trial court is to conduct a Hammond/Green Oil hearing without consideration of the potential bad-faith claim and without consideration of Dr. Gillis's wife's portion of jointly owned assets. We instruct the trial court to make a return to remand within 90 days.

18

1120292 and 1121205

1121205--AFFIRMED.

Moore, C.J., and Stuart, Bolin, Parker, and Wise, JJ., concur.

Shaw, J., concurs in the result.

Murdock, J., dissents.

Bryan, J., recuses himself.

1120292--REVERSED AND REMANDED WITH INSTRUCTIONS.

Moore, C.J., and Stuart, Bolin, and Wise, JJ., concur.

Murdock, J., concurs specially.

Parker and Shaw, JJ., concur in part and dissent in part.

Bryan, J., recuses himself.

1120292 and 1121205

PARKER, Justice (concurring in part and dissenting in part as to case no. 1120292).

In case no. 1120292, I concur in part and dissent in part; I join Justice Shaw's writing insofar as he dissents from Part II.B.1 of the main opinion. I concur fully in Part II.B.2 of the main opinion, refusing to revive § 6-5-547, Ala. Code 1975.

1120292 and 1121205

MURDOCK, Justice (dissenting as to case no. 1121205 and concurring specially as to case no. 1120292).

I. Case No. 1121205:
Dr. Gillis's Rule 60(b), Ala. R. Civ. P., Motion

Dr. Gillis filed a motion seeking relief under Rule 60(b)(6), Ala. R. Civ. P., from the liability aspect of the trial court's judgment on the ground that a juror had prior knowledge of, and a bias against, Dr. Gillis not disclosed by her during voir dire. I respectfully disagree with the reasons voiced in Part II.A. of the main opinion for rejecting what I consider to be Dr. Gillis's compelling position on this issue.[6]

---

[6]Although the main opinion ultimately denies relief to Dr. Gillis in relation to his Rule 60(b), Ala. R. Civ. P., motion (a decision with which I disagree as discussed below), the main opinion, correctly in my view, does determine that Dr. Gillis's motion is properly reviewed as a Rule 60(b)(6) motion. In so doing, the main opinion notes that the motion was not filed within the four-month window prescribed for a motion filed under Rule 60(b)(2).

Unlike Rule 59, Ala. R. Civ. P., the express office of a Rule 60(b) motion is to relieve a party from a judgment that has become "final" and enforceable (see, e.g., Smith v. Cowart, 68 So. 3d 802, 809 (Ala. 2011) (explaining that a judgment "'"became 'final' within the contemplation of Rule 60(b)"'" only upon the disposition of an intervening postjudgment motion under Rule 59 (quoting Ex parte Haynes, 58 So. 3d 761, 764 (Ala. 2010))); Arnold v. Sullivan, 131 F.R.D. 129, 131 (N.D. Ind. 1990)(noting that "a Rule 60(b) motion can only relieve a party from a 'final judgment'")), a condition that does not come into being until 30 days after the entry of

21

The main opinion appears to reference two separate reasons for upholding the trial court's denial of Dr. Gillis's Rule 60(b)(6) motion. It begins its analysis with the

---

a judgment (see, e.g., <u>Crisco v. Crisco</u>, 294 Ala. 168, 313 So. 2d 529 (1975) (noting that a judgment remained within the breast of the court for 30 days, during which it could be set aside on the court's own motion)). Further, a timely filed Rule 59(e) motion, which by definition is one filed within that 30-day period, suspends the finality of the judgment for purposes of both the availability of, and the time limitations upon, relief under various provisions of Rule 60(b). E.g., <u>Arnold v. Sullivan</u>, supra.

The trial court entered a judgment on June 18, 2012. Within 30 days thereafter, Dr. Gillis filed a postjudgment motion under Rule 59. The trial court ruled on that motion on October 30, 2012. Dr. Gillis's Rule 60(b) motion was filed on March 15, 2013, approximately four and one-half months after October 30. Given the particular procedural history of this case, including the lack of any basis for suspending the finality of the trial court's October 30 judgment, the main opinion is correct to the extent it indicates that Dr. Gillis's motion was not filed within four months of the date of that judgment.

Irrespective of the timing of its filing, however, I question whether Dr. Gillis's motion goes to the issue of "newly discovered evidence" within the meaning of Rule 60(b)(2), given that it speaks to the procedural unfairness of the proceeding and not to evidence relating to the merits of the action. See § 12-13-11(a), Ala. Code 1975 (identifying as separate grounds for postjudgment relief "newly discovered evidence," on the one hand, and "irregularity in the proceedings" and "[m]isconduct of the jury," on the other hand); cf. <u>Ex parte Pierce</u>, 851 So. 2d 606 (Ala. 2000) (holding that a claim of juror misconduct raised in a postconviction petition shall not be treated as a claim of newly discovered evidence under Rule 32.1(e), Ala. R. Crim. P.).

following statement describing the issue that must be decided

in this appeal:

> "We must consider whether Dr. Gillis had access to the information on the juror before the judgment became final so that, if Dr. Gillis had done everything reasonably within his power, he could have discovered the information at that time. '[R]elief [pursuant to Rule 60(b)] should not be granted to a party who has failed to do everything reasonably within his power to achieve a favorable result before the judgment becomes final; otherwise, a motion for such relief from a final judgment would likely become a mere substitute for appeal and would subvert the principle of finality of judgments.' Osbom v. Roche, 814 So. 2d 811, 818 (Ala. 2001)."

___ So. 3d at __.

After framing the above-stated procedural and timing

issue, however, the main opinion proceeds to address, not the

timeliness of Dr. Gillis's discovery and presentation of

evidence of the juror's bias, but the substantive merits of

the bias issue raised by that evidence. In the same paragraph

quoted above, the main opinion suggests that this Court must

defer to a conclusion by the trial court as to the substantive

issue of the juror's bias, stating: "The record reflects that

the trial court considered conflicting affidavits concerning

the extent of Dr. Gillis's treatment of the juror's husband

and whether the juror had ever spoken disparagingly about Dr.

23

Gillis at any time." ___ So. 3d at ___. Apparently on this basis, the main opinion then concludes that Dr. Gillis has failed to meet his burden of proof.

My problem with the rationale upon which the main opinion ultimately rests its affirmance of the trial court's judgment is simply this: The trial court actually did <u>not</u> consider the conflicting affidavits referenced. That is, the trial court did not decide which of those affidavits was more persuasive or, in turn, reach the substantive issue of bias by the juror as to which those affidavits "conflict." Instead, the trial court's reason for rejecting Dr. Gillis's motion for relief under Rule 60(b)(6) was in fact the procedural/timing issue initially noted above. The trial court explained its own reasoning as being that Dr. Gillis had "'not established that he did everything reasonably within his power to discover the information upon which his motion is based and obtain relief from the verdict before the judgment entered thereon became final.'" __ So. 3d at __ (quoting trial court's order). In other words, the trial court did <u>not</u> consider or decide between the dueling versions of the facts relating to whether the juror did in fact have an undisclosed foreknowledge of and

24

a bias against Dr. Gillis.  Instead, the trial court merely concluded that  Dr. Gillis did not seek out and discover the facts alleged in his Rule 60(b)(6) motion in a timely manner and, in turn, did not file that motion in a timely manner (a ground I will address further below).

As to the merits of the substantive issue of nondisclosure and bias, the "evidence" is not ore tenus evidence that would prevent its initial consideration by this Court.  First, it is plain on the face of the trial transcript -- indeed it is undisputed by the plaintiff -- that the juror made no disclosures during voir dire in response to multiple questions that should have elicited any foreknowledge by her of Dr. Gillis.  The question whether those nondisclosures represent any impropriety, then, turns only on whether there was anything to disclose.  As to this issue, the only evidence either party chose to present to the trial court was in the form of written affidavits.  Because this Court is as capable as the trial court of reading those affidavits, I question why we should not proceed to do so and decide the issue.[7]

_____

[7]It is true that a trial judge generally is in a better position to judge the likelihood of prejudice resulting from juror misconduct during voir dire.  This is true, however, largely because of the need in most cases for the judge to

assess the ore tenus answers given by jurors in response to questions posed during voir dire:

> "'The trial court was able to observe the mannerisms, inflections in voice, and other characteristics of the jurors whose answers were at issue -- in other words, things that could reflect upon the jurors' credibility but that are beyond this Court's inherently limited ability to review by appellate transcript ....'"

Hood v. McElroy, 127 So. 3d 325, 340 (Ala. 2011) (quoting Colbert Cnty.-Northwest Alabama Healthcare Auth. v. Nix, 678 So. 2d 719, 723 (Ala. 1995)).

There are two aspects of this case that make this general rule inapplicable here. First, as noted above, the trial court did not make any findings of probable prejudice; it did not consider the substance of the affidavits or compare the "facts" in them to the answers given by the juror during voir dire. It instead decided the matter on a procedural basis, finding that Dr. Gillis had failed to prove that his motion was timely.

Second, and as also noted, the voir dire questions and lack of responses in this case are undisputed, there are no assessments to be made of the juror's answers, and the "probable prejudice" is undeniable if the "facts" in the affidavits submitted by Dr. Gillis are to be taken as true. Because ore tenus testimony would not be involved in assessing those affidavits, I see no reason why the trial court would be better positioned than this Court to discern the credibility of the competing testimony as it now exists in this case.

Of course, nothing would prevent us from remanding the case with instructions for the trial court to conduct a hearing for the purpose of receiving and considering live testimony from available witnesses. On the record currently before us, however, and given the particular manner in which the issue is presented in this case, I see no basis for giving

In the absence of a hearing and the receipt of live testimony from the witnesses, it appears to me that the detail presented, and the employment risks faced by the affiants who testified on behalf of Dr. Gillis, make for a compelling conclusion in his favor. Dr. Gillis submitted affidavit testimony from two women who were work-place subordinates of the juror's and whose affidavits corroborated one another. One of these affiants testified as follows:

> "5. I would estimate that on at least twenty occasions between 2007 and June 11, 2012, it [was] necessary for me to leave my work during a work day to go to an appointment at Dr. Gillis' office. On most of these occasions, I would tell [the juror] that I had an appointment at Dr. Gillis' office and that I would need to be off from work to attend those appointments. On other of these occasions, I would tell [the juror] that I needed to be away from work for a short time for personal reasons.
>
> "6. I would estimate that on at least fifty percent of the occasions prior to June 11, 2012, when I told [the juror] that I needed to attend an appointment at Dr. Gillis' office, [the juror] has made negative comments about Dr. Gillis. The last such occasion that I remember occurred in 2012, before June 11, 2012.
>
> "7. An example of the kind of negative comment [the juror] made about Dr. Gillis was calling him a 'quack.' On one occasion, when I was discussing with

deference to the trial court.

27

[the juror] my being treated by Dr. Gillis, [the juror] said that the only thing wrong with me was the doctor I was seeing. On at least five other occasions, [the juror] told me that I needed to get a different doctor.

"8. In or around 2007, I was having problems with my heart. Dr. Gillis ordered a stress test for me. I mentioned this to [the juror]. [The juror] then explained to me why she did not like Dr. Gillis. Specifically, [the juror] told me that years before, her husband had been to see Dr. Gillis and had complained to Dr. Gillis that he ... was having pain in his stomach or abdominal area. [The juror] told me that Dr. Gillis had sent [her husband] home, and that shortly thereafter, [her husband] had to be seen by another doctor and had to have surgery to remove his gallbladder. [The juror] said Dr. Gillis had failed to timely and properly diagnose [her husband's] condition.

"9. I cannot remember the exact dates of the occasions on which [the juror] made all of the comments, but I do recall that [the juror] made these kinds of negative comments about Dr. Gillis so many times that eventually, instead of telling [the juror] that I needed to be away from work to attend an appointment at Dr. Gillis' office, I began telling [the juror] that I needed to be away from work for personal reasons, I do not recall the specific date of the last time that [the juror] made negative comments about Dr. Gillis prior to June 11, 2012, but I do recall that [the juror] did ma[k]e negative comments about Dr. Gillis in 2012 prior to June of 2012."

Turning now to the trial court's stated reason for denying Dr. Gillis Rule 60(b)(6) relief, I am not sure what it is that Dr. Gillis should have done differently. Neither the

28

trial court nor the main opinion tell us specifically what more would have been needed for Dr. Gillis to "'establish[] that he did everything reasonably within his power to discover the information upon which his motion is based and obtain relief from the verdict before the judgment entered thereon became final.'"[8]   __ So. 3d at __.

First and foremost, it is undisputed that the attorneys for both parties engaged in ample voir dire questioning designed to ferret out any foreknowledge by the juror of Dr. Gillis.  Among other questions, the venire was asked: "Do you know Dr. Gillis?"; "Have any of you, or your immediate family members been a patient at any time of Dr. Gillis?"; "Any of you, any member of your immediate family or any of the providers at Lister Healthcare where you felt they did something wrong or caused you or members of your family harm?"; and "Is there anyone that feels as though you have

---

[8]The trial court's approach appears to assume incorrectly that the plaintiff bears no burden to support his assertion that Dr. Gillis did not timely move for postjudgment relief. Dr. Gillis  made an adequate showing that he acted timely; it does not fall to him to disprove all other possibilities of ways in which he might have been able to acquire the information at issue even sooner than he did, especially since neither the plaintiff nor the trial court is able to articulate or to make any showing as to what more Dr. Gillis should have done.

some information that you need to give knowing what type of case this is that you have not been able to give because [the attorney for the opposing party] and I did not ask the right question?" The juror did not respond affirmatively to any of these questions.

This Court has been clear: a litigant must be able to rely upon the information the members of the venire provide in voir dire. "'[T]he parties in a case are entitled to true and honest answers to their questions on voir dire, so that they may exercise their peremptory strikes wisely.'" Ex parte Dixon, 55 So. 3d 1257, 1260 (Ala. 2010) (quoting Ex parte Dobyne, 805 So. 2d 763, 771 (Ala. 2001)). "The fairness of our jury system ... depends on such answers." Dunaway v. State, [Ms. 1090697, April 18, 2014] __ So. 3d __, __ (Ala. 2014).

The observations made by this Court in Ex parte Harrison, 61 So. 3d 986, 990-91 (Ala. 2010), a criminal case, are equally applicable here:

> "The State contends ... that Harrison failed to explain in his Rule 32[, Ala. R. Crim. P.,] petition why he could not have reasonably discovered the alleged juror misconduct in time to assert that claim in his motion for a new trial or on appeal.

30

"As we indicated in [Ex parte] Burgess, [21 So. 3d 746 (Ala. 2008),] however, the very nature of juror misconduct is such that a defendant typically will not be aware that there is any misconduct to be discovered. Placing a requirement on a defendant to uncover any and all possible juror misconduct without reason to know what type of misconduct the defendant might be looking for or, in fact, whether any misconduct occurred, would require criminal defendants to embark on a broad-ranging fishing expedition at the conclusion of every criminal trial or waive the right to complain of any juror misconduct the defendant might ultimately discover. Moreover, when it comes to voir dire examination of jurors, the defendant has every right to expect that jurors will provide truthful and accurate responses. ... As in Burgess, there is no evidence in the record indicating that Harrison should have been aware before he filed his motion for a new trial or his direct appeal that some jurors had provided untruthful or inaccurate answers during voir dire examination."

Of course, the foregoing is not to say that upon being put on notice after trial of the possibility that a juror had not been forthcoming in response to voir dire questioning, a litigant such as Dr. Gillis has no obligation to act reasonably promptly to investigate the issue and to bring it to the court's attention once the investigation reveals a sufficient basis for doing so. Again, however, neither the trial court nor the main opinion explains what Dr. Gillis should have done differently in this regard. Dr. Gillis gave undisputed testimony in his affidavit that he became aware of

31

the juror's foreknowledge of him and her alleged bias toward him only after he had filed his first appeal in case no. 1120292 on December 7, 2012. Dr. Gillis also gave undisputed testimony by affidavit that he had no access to the medical records from his prior practice that would have revealed his treatment of the juror's husband. It is apparent that, after being made aware of the juror's alleged bias, Dr. Gillis's attorneys proceeded to investigate what Dr. Gillis had been told pertaining to the juror. Over the next several weeks, they obtained affidavits from two of the juror's subordinates that, if given credence, would present a compelling case of juror bias. Armed with these affidavits, the attorneys then filed a motion for Rule 60(b)(6) relief on March 15, 2013. That is, the record appears to reflect that Dr. Gillis took reasonable and prompt steps to learn of juror bias and filed his motion reasonably promptly after learning of evidence that the juror was biased against him and had not been forthcoming in her answers to voir dire questions and then conducting a reasonable investigation into the same.[9]

---

[9]"'What constitutes a "reasonable time" depends on the facts of each case, taking into consideration the interest of finality, the reason for the delay, the practical ability to learn earlier of the grounds relied upon, and the prejudice to

Given the foregoing, I find no basis for the trial court's conclusion that Dr. Gillis failed to prove that he could not have discovered the information that was the basis for his motion before the judgment became final. At the very least, given the nature of the issue presented and the lack of any evidence indicating that Dr. Gillis had cause to look behind the juror's voir dire answers, Dr. Gillis proved all he needed to prove to make out a prima facie case of timeliness on his part. The plaintiff cannot simply contend that there is some unidentified further, or sooner, action for which Dr. Gillis should be held responsible. In the face of the "case" made by Dr. Gillis, the position taken by the plaintiff (and the trial court) amounts to expecting someone in Dr. Gillis's position to disprove all other possibilities, i.e., to prove a negative. The plaintiff (and the trial court) must at least articulate for us what further action should have been taken by Dr. Gillis and present evidence thereof sufficient to have shifted the ultimate burden of proof as to that issue to Dr. Gillis. They did neither here.

---

other parties.'" Ex parte Hicks, 67 So. 3d 877, 880 (Ala. 2011) (quoting Ex parte W.J., 622 So. 2d 358, 361 (Ala. 1993)).

33

## II. Case No. 1120292

### A. Preliminary Matters

Although I disagree for the reasons stated above with the main opinion's decision to deny Dr. Gillis relief in the form of a new trial as to the issue of liability, I agree with the main opinion in the separate appeal as to the need for the trial court to reassess the award of punitive damages if a new trial on liability is not to be had. I agree with the main opinion that only Dr. Gillis's assets and his portion of the assets he holds jointly with his wife should be considered on remand. I would add that I find problematic as a basis for the award made here the trial court's statement that Dr. Gillis "has a significant net worth." The ambiguous nature of this finding deprives it of any significance as a basis for appellate review of the specific award actually made. One million dollars undoubtedly would be considered by many as a "significant net worth," but it presumably would not provide a basis for a $5 million punitive-damages award.

### B. Overruling Boudreaux

Consistent with my concurrence in case no. 1120292, I fully agree that Boudreaux v. Pettaway, 108 So. 3d 486 (Ala. 2012), should be overruled. In his special writing, Justice Shaw disagrees with overruling Boudreaux, stating that he finds the reasons given in the main opinion for doing so insufficient. I write to further explain my reasons for concurring in this portion of the main opinion.

Deciding on an amount of punitive damages to be awarded based on what a defendant might or might not be able to collect some day from a third party as a result of some future, yet unfiled and unlitigated lawsuit -- a lawsuit that may never be filed or survive to a judgment or settlement -- requires improper speculation by the court. As noted below, especially problematic is the fact that following such an approach necessarily injects a circularity of reasoning that logically would support an award of any amount a judge might select.

The decision in Boudreaux was based on this Court's 1993 decision in Mutual Assurance, Inc. v. Madden, 627 So. 2d 865 (Ala. 1993), a case that did indeed reference the possibility

35

of assessing a physician's wealth (for purposes of setting a punitive-damages award) on a possible future recovery by the physician against his liability insurer on a bad-faith claim. The statement in Madden referencing such an approach, however, was expressly recognized therein as dictum. Other than this Court in Boudreaux, no court -- federal or state -- has allowed such an approach in the 21 years since Madden was decided. In their amicus curiae brief filed in this Court, the Medical Association of the State of Alabama offers the following common-sense arguments against the approach referenced in Madden:

> "[The physician's insurer] ProAssurance was not a party to this matter and the issue of whether it acted negligently and/or in bad faith in failing to settle this case has not been properly presented to any court. Nonetheless, based on the trial court's ruling, Dr. Gillis' hypothetical claims against ProAssurance have essentially been reviewed and predetermined without ever having been filed or litigated. ProAssurance has not had any opportunity to present evidence in defense of such claims, nor has there been any enforceable ruling on this issue -- just the speculative and preliminary finding of the trial court."

After noting that the foregoing approach raises due-process concerns, the amicus brief continues:

36

"Second, the trial court's preemptive determination on this issue will now essentially force Dr. Gillis to file a lawsuit against his insurer, regardless of whether he wants to or not. ...

"....

"Another flaw in the reasoning of the trial court is that it failed to consider litigation expenses that the physician must bear in a bad faith action. As an example, Dr. Gillis likely would recover $3,000,000 in his hypothetical bad faith action against his insurer if he prevails. Assuming he retains counsel on a contingency basis [and pays necessary expenses] ... the physician [ultimately] could be short as much as $1,000,000 to $1,300,000.

"Even more troubling, Dr. Gillis would have to take [a] position ... contrary to the position taken heretofore by Dr. Gillis, who maintained throughout the litigation (with ample evidentiary support and expert testimony) that he did not breach the standard of care as alleged by the Plaintiff. ...

"Indeed, Dr. Gillis[] ... would be acting at the behest of the Plaintiff[, who] has essentially forced his hand to pursue additional litigation in hopes that the trial court's post-judgment determination was correct and that the factfinder who ultimately reviews his future bad faith lawsuit agrees so that he can one day satisfy the judgment against him.

"[Finally], the Medical Association believes that the trial court's ruling should be reversed because it will continue to stand (along with the $5,000,000 judgment) even if Dr. Gillis does not prevail in his hypothetical bad faith lawsuit, leaving him no recourse or way to 'correct' the

37

trial court's erroneous presumption that he would prevail and that he would 'never personally feel any adverse financial effects of the verdict rendered against him.'"

In Boudreaux, I dissented and wrote specially to elaborate upon concerns of the nature identified above:

"Despite [a] holding [on other grounds], and simply because 'the parties request[ed] that we also address' the issue, 627 So. 2d at 866, the Court [in Madden] went further and addressed whether, in a remittitur proceeding, it was proper for a trial court to consider a physician's potential for recovering from his liability insurer the amount of the judgment against him that exceeds the amount of his insurance coverage. Id. Thus, the conclusion from Madden relied upon by the main opinion is dictum and, therefore, it is not binding upon this Court in the present case....

"In asking this Court to overrule the dictum in Madden, the defendants do not ask us to dispense with a persuasive holding of this Court. Indeed, in the only other case in which this Court has addressed this issue -- Tillis Trucking Co. v. Moses, 748 So. 2d 874 (Ala. 1999) -- the Court distinguished Madden on the ground that the potential bad-faith claim in Tillis Trucking Co. was 'too speculative' to affect remittitur. 748 So. 2d at 887. I have been unable to locate a court in any other jurisdiction -- state or federal -- that has decided as the Madden Court did on this issue since Madden was decided."

Boudreaux, 108 So. 3d at 511-12 (Murdock, J., dissenting). I also made note of a strongly critical dissent written by

Justice Maddox in <u>Madden</u> and offered some additional observations:

> "'[T]he trial court cannot determine the value of a potential bad faith claim for purposes of the <u>Hammond-Green Oil Co.</u> hearing without <u>engaging in rank speculation</u> as to the value of such an asset and thereby depriving Dr. Evans of his constitutional right to a post-verdict assessment of the jury's award of punitive damages.'

> "627 So. 2d at 867 (Maddox, J., concurring in part and dissenting in part) (emphasis added).

> "... Without conducting a separate trial on the physician's third-party claim, there is simply no way to know how much worth, if any, should be placed on a potential bad-faith claim by the defendants against their liability-insurance carrier. As any plaintiff's lawyer can attest, the road from the accrual of a potential cause of action to the entry of a judgment and, eventually, collection of that judgment, can be a long one full of pitfalls and potential 'exits.' A great many obstacles -- at least some of which would not become apparent until litigation actually commences -- could prevent any recovery on such a claim, or at least prevent the amount of the recovery speculated to be 'in the offing' by a trial court in some prior, collateral proceeding. Including a potential claim as part of a defendant's assets requires a trial court to transform itself from a fact-finder into something more akin to a fortune teller.

> "Aside from the speculative nature of such a claim in itself, there is a problem of timing. A punitive-damages award, like the award in any final

39

judgment, is due as soon as the judgment becomes final. If the defendant cannot or does not voluntarily pay the award from its liquid assets, the plaintiff may seek immediately to execute upon the defendant's assets, both liquid and illiquid. On the other hand, any judgment to be obtained by the defendant upon a potential claim against its liability-insurance carrier would come a long time -- perhaps years -- after the current judgment is enforceable. Thus is raised the very real specter that a judgment intended by the law to 'sting' a physician or other defendant will instead have the effect of financially destroying that physician or defendant. See Ex parte Vulcan Materials Co., 992 So. 2d 1252, 1260 (Ala. 2008) (noting that '[s]ociety's goal [in permitting punitive damages] is to deter -- not to destroy -- the wrongdoer' and that '[t]o effectuate that purpose, a punitive-damages award "'ought to sting in order to deter.'"' (quoting Green Oil Co. v. Hornsby, 539 So. 2d 218, 222 (Ala. 1989), quoting in turn Ridout's-Brown Serv., Inc. v. Holloway, 397 So. 2d 125, 127 (Ala. 1981) (Jones, J., concurring specially))).

"On an even more fundamental plane, I offer two additional observations. First, any potential bad-faith claim the defendants may have against their liability insurer did not even exist until the judgment in this case was made. See Evans v. Mutual Assurance, Inc., 727 So. 2d 66, 67 (Ala. 1999) (stating that 'a cause of action arising out of a failure to settle a third-party claim made against the insured does not accrue unless and until the claimant obtains a final judgment in excess of the policy limits'). As a corollary, the consideration of such a potential recovery creates a circularity of reasoning in which the court can, for all practical purposes, consider the availability of a third party to pay damages in whatever amount might

40

be set. As one court has put it, because the potential claim 'was not in existence before the jury entered its verdict, it could not be considered as part of [the defendants'] net worth in determining the amount of the award. Otherwise, the size of the punitive award could be unlimited....' Wransky v. Dalfo, 801 So. 2d 239, 242 (Fla. Dist. Ct. App. 2001) (emphasis omitted). As another court has explained, a potential claim against an insurer should not be considered in establishing a punitive-damages award because such an asset would make the insurer 'responsible to pay damages in an amount that would never have been considered by the parties were the insurance company not the responsible entity.' Battista v. Western World Ins. Co., 227 N.J.Super. 135, 151, 545 A.2d 841, 849 (N.J.Super.Law Div. 1988), rev'd in part on other grounds sub nom., Battista v. Olson, 250 N.J.Super. 330, 594 A.2d 260 (N.J. Super. App. Div. 1991)."

Id. at 512-13 (final emphasis added).

It is for the reasons stated above that I concur today in overruling Boudreaux.

C. The Inapplicability of
Normal Punitive-Damages Remittitur Factors to the
"Punitive Damages" Awarded in Wrongful-Death Cases

In addition to the foregoing, my vote today is consistent with concerns on my part as to whether we can apply traditional Hammond/Green Oil[10] and BMW/Gore[11] factors, or at

---

[10]Hammond v. City of Gadsden, 493 So. 2d 1374 (Ala. 1986), and Green Oil Co. v. Hornsby, 539 So. 2d 218 (Ala. 1989).

[11]BMW of North American v. Gore, 517 U.S. 559 (1996).

41

least many of them, to review that brand of "punitive damages" awarded in Alabama wrongful-death cases, given (1) that such damages can be, and often are, awarded for mere negligence, (2) that there is no separate, underlying compensatory-damages award against which to make any comparative review of those damages, see, e.g., Mobile Infirmary Ass'n v. Tyler, 981 So. 2d 1077, 1107 (Ala. 2007) (Lyons, J., dissenting and rethinking the propriety of attempting to apply the second BMW/Gore factor (comparison of punitive-damages award to the compensatory-damages award) to Alabama wrongful-death awards) and (3) that such damages often serve as a practical matter as a substitute for de jure compensatory damages.

Alabama stands alone among all the states in the union in telling its juries in wrongful-death actions that they may award only what are referred to as "punitive damages." Our precedents indicate that this approach is grounded in the notion, to which I offer no objection, that it is impossible to place a dollar value on a human life. The result, however, is largely a legal fiction in which, as a practical matter, juries do in fact award damages not based solely on the traditional punitive-damage factors but that, in many cases,

42

de facto serve as compensatory damages (sometimes in combination with an element of punishment). Thus it is that "punitive damages" can be awarded against defendants whose mere negligence causes a death. See, e.g., Cherokee Elec. Coop. v. Cochran, 706 So. 2d 1188, 1194 (Ala. 1997) (holding that death is a great harm and that Alabama can "'attempt to preserve life by making homicide expensive'" (quoting Louis Pizitz Dry Goods Co. v. Yeldell, 274 U.S. 112, 116 (1927))). See also, e.g., McKowan v. Bentley, 773 So. 2d 990 (Ala. 1999) (affirming a verdict of $2,000,000 in a wrongful-death medical-malpractice case, even though the trial court stated that it disagreed with the jury's verdict of negligence). For that matter, we long have held that mere vicarious liability, involving no actual culpability on the part of the defendant, will support an award of punitive damages for a wrongful death. See Louis Pizitz Dry Goods Co., 274 U.S. at 116; Ala. Code 1975, § 6-11-27 & -29 (the rule that a principal is not ordinarily liable for punitive damages based merely on the conduct of an agent or employee does not apply in wrongful-death cases).

Alabama has chosen to treat wrongful-death actions differently -- i.e., to allow the award of what we refer to in these cases as "punitive damages," despite the absence of some of or all the normal factors required for doing so -- as a way to recognize the enormity and finality of the loss of a life and the public interest in deterring conduct that causes this loss, while simultaneously continuing to give an understandable "nod" to the principle that we cannot place a compensatory dollar value on this loss. See Campbell v. Williams, 638 So. 2d 804, 810-11 (Ala. 1994); McKowan, 773 So. 2d at 992, 998. Thus it is that, in Tillis Trucking Co. v. Moses, 748 So. 2d 874, 889 (Ala. 1999), this Court reaffirmed the principle that "punitive damages" are appropriate in wrongful-death cases without respect to the level of culpability on the part of the defendant that normally plays such an important role in the assessment of such damages:

> "'Participation in actions causing the death of a human being, even if slight, can result in liability without regard to the degree of culpability, and this result, the legislature believes, will lead to greater diligence in avoiding the loss of life.'"

748 So. 2d at 889 (quoting Campbell, 638 So. 2d at 810-11).

44

Another criterion used to assess the appropriateness of a traditional punitive-damages award is the relationship of the punitive-damages award to the harm caused, as measured by the underlying compensatory-damages award. Obviously, however, because Alabama does not allow the recovery of compensatory damages per se in a wrongful-death action, this factor cannot not be utilized in wrongful-death actions; there is no mathematical ratio for us to consider. Tillis Trucking Co., 748 So. 2d at 890.

Yet another discordant note in our attempt to apply normal punitive-damages/remittitur factors to awards in wrongful-death actions, at least in medical-malpractice cases, is this: Green Oil contemplates consideration of "the existence and frequency of similar past conduct" by the defendant, Green Oil, 539 So. 2d at 223; however, § 6-5-551 of the Alabama Medical Liability Act of 1987 expressly prohibits the discovery, or introduction at trial, of any evidence concerning other acts or omissions of a defendant health-care provider in a medical-malpractice action. See Ex parte Anderson, 780 So. 2d 190 (Ala. 2000).

D. Concerns Regarding De Novo Review

45

Not only does the unique nature of the "punitive damages" available in Alabama wrongful-death jurisprudence raise serious questions as to whether the traditional remittitur factors "work" in that context, it concomitantly calls into question the use of a de novo standard of review. It is true that the United States Supreme Court has adopted a de novo standard for assessing the BMW/Gore factors. See Robbins v. Sanders, 927 So. 2d 777, 789 (Ala. 2005). The BMW/Gore factors, however, apply only to federal court consideration of whether an award passes constitutional muster. For some time, I have questioned whether that fact requires us to abandon the deferential review that historically has been given by appellate courts, including Alabama appellate courts, especially to non-constitutional challenges to punitive-damages awards (i.e., our Hammond/Green Oil factors). Such abandonment would seem to be especially problematic, given that the trial court's decision in such matters involves assessment by it of ore tenus evidence.

I reiterate here what I said in Boudreaux, 108 So. 3d at 513 n.20 (Murdock, J., dissenting):

> "The main opinion applies a de novo standard of review to the challenge to the punitive-damages

award made under state law, see Hammond v. City of Gadsden, 493 So. 2d 1374 (Ala. 1986), Green Oil, supra, as well to the challenge made based upon the United States Supreme Court's decision in BMW of North America, Inc. v. Gore, 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996). 108 So. 3d at 504. I struggle somewhat with the notion that some deference is not owed a trial judge who has sat through the trial along with the jury and is being asked to use his or her best judgment in determining the level of punitive damages appropriate in the case before him or her. Before Acceptance Insurance Co. v. Brown, 832 So. 2d 1 (Ala. 2001), and Horton Homes, Inc. v. Brooks, 832 So. 2d 44, 57 (Ala. 2001), our cases clearly recognized that deference was owed to a trial court's decision as to remittitur and that the appellate standard of review was an abuse-of-discretion standard. See, e.g., General Motors Corp. v. Edwards, 482 So. 2d 1176, 1198 (Ala. 1985) (overruled on other grounds by Schwartz v. Volvo North America Corp., 554 So. 2d 927 (Ala. 1989) (stating that 'this Court has generally followed the principle that a trial court is accorded a large measure of discretion in determining whether to grant a remittitur' and that '[w]e have also generally held that when a trial court exercises its discretion to order a remittitur, its decision is presumed correct and will not be reversed on appeal absent evidence of an abuse of discretion' (citing Todd v. United Steelworkers of America, 441 So. 2d 889, 892 (Ala. 1983)))); Henderson v. Alabama Power Co., 627 So. 2d 878, 910 (Ala. 1993), abrogated by Ex parte Apicella, 809 So. 2d 865 (Ala. 2001) (Houston, J., dissenting) (observing that even before the ratification of the Alabama Constitution of 1901, 'in cases involving egregious conduct, discretionary awards of punitive damages by juries were subject to post-judgment review by the courts under an abuse of discretion standard'). See also Jenelle Mims Marsh, Alabama Law of Damages § 7:6 (6th ed.) (noting the application of a de novo standard to challenges to

47

the federal constitutionality of a punitive-damages award under the three guideposts set by <u>Gore</u>, but the application of an abuse-of-discretion standard to challenges to the appropriateness of a punitive-damages award under state law). We are not asked in this case, however, to revisit this Court's decisions in <u>Brown</u> and <u>Horton Homes</u> ...."

By continuing to embrace complete de novo review of punitive-damages awards in wrongful-death actions, we essentially place ourselves in the position of the jury and the trial court, substituting our own judgment to set the only damages awardable in this type of case. To put it colloquially: "Something is wrong with this picture."

SHAW, Justice (concurring in the result as to case no. 1121205 and concurring in part and dissenting in part as to case no. 1120292).

As to case no. 1121205, Part II.A of the main opinion, I concur in the result. As to case no. 1120292, I concur in part and dissent in part. Specifically, as to Part II.B.2, I concur, and as to Part II.B.1, as discussed below, I dissent.

In Part II.B.1, the main opinion overrules this Court's recent decision in Boudreaux v. Pettaway, 108 So. 3d 486 (Ala. 2012), "to the extent that it [holds] that a potential bad-faith claim and/or negligent-failure-to-settle claim against a liability-insurance carrier may be considered as an asset for purposes of a Hammond/Green Oil[12] review and a remittitur analysis." ___ So. 3d at ___. I respectfully dissent.

Stare decisis "'is the only thing that gives form, and consistency, and stability to the body of the law. Its structural foundations, at least, ought not to be changed except for the weightiest reasons.'" Exxon Corp. v. Department of Conservation & Natural Res., 859 So. 2d 1096, 1102 (Ala. 2002) (quoting Bolden v. Sloss-Sheffield Steel & Iron Co., 215

---

[12]Hammond v. City of Gadsden, 493 So. 2d 1374 (Ala. 1986), and Green Oil Co. v. Hornsby, 539 So. 2d 218 (Ala. 1989).

49

Ala. 334, 340, 110 So. 574, 580 (1925) (Somerville, J., dissenting)). This Court has turned away from such stability of the law when it "'has had to recognize on occasion that it is necessary and prudent to admit prior mistakes and to take the steps necessary to ensure that we foster a system of justice that is manageable and that is fair to all concerned.'" Ex parte Capstone Bldg. Corp., 96 So. 3d 77, 88 (Ala. 2012) (quoting Foremost Ins. Co. v. Parham, 693 So. 2d 409, 421 (Ala. 1997)).

I see no "prior mistake" of this Court explained in the main opinion that would require that we back away from Boudreaux or Mutual Assurance, Inc. v. Madden, 627 So. 2d 865 (Ala. 1993), upon which Boudreaux relied. Both Boudreaux and Madden recognize limits to the application of this principle. In Madden, the "trial court had before it considerable evidence" to support its determination, 627 So. 2d at 866, and in Boudreaux, "[t]he trial court made detailed findings explaining its evaluation of the merits of the potential claim and the evidence it had considered in reaching that

determination." 108 So. 3d at 510.[13] However, the consideration of a potential bad-faith claim and judgment as an asset has been rejected by this Court when it is "too speculative" and is not supported by "considerable evidence." Tillis Trucking Co. v. Moses, 748 So. 2d 874, 887-88 (Ala. 1999).

I see no reason to abandon our precedent in Boudreaux and Madden. To me, discounting a potential bad-faith claim as an asset of a defendant may result in a windfall for the defendant if an award against the defendant is later paid for in a judgment entered in an action by the defendant against the defendant's insurer with punitive damages to boot. See also Ex parte Vulcan Materials Co., 992 So. 2d 1252, 1261 (Ala. 2008) ("[A] defendant cannot argue as a basis for reducing the punitive-damages award that the award 'stings' too much, in the absence of evidence of the defendant's financial status.").

---

[13]In Boudreaux, there was actually no argument on appeal "that the trial court lacked sufficient information to adequately assess the defendants' potential claim against their insurer." 108 So. 3d at 509.

Instead of a wholesale overruling of <u>Boudreaux</u> (and, sub silentio, <u>Madden</u>), I would review, as we have previously done in <u>Boudreaux</u> and <u>Madden</u>, whether the trial court erred in assigning any value to Dr. Gillis's potential claim.[14]

Parker, J., concurs in discussion of Part II.B.1 of the main opinion.

---

[14]Part II.B.1 also directs "that the trial court, in calculating Dr. Gillis's assets under <u>Hammond/Green Oil</u>, should not consider Dr. Gillis's wife's portion of their jointly owned assets." ___ So. 3d at ___. I see no argument on appeal by Dr. Gillis as to this issue; thus, I would not address it.